IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 2, 2011 Session

**HENRY ZILLON FELTS v. STATE OF TENNESSEE**

**Appeal by permission from the Court of Criminal Appeals
Circuit Court for Sumner County
No. 879-2007   Dee David Gay, Judge**

_____

**No. M2009-00639-SC-R11-PC - Filed November 10, 2011**

_____

In this post-conviction appeal, we must determine whether Petitioner Henry Zillon Felts was denied the effective assistance of counsel at his trial for aggravated burglary and attempted first degree murder.   The post-conviction court vacated Petitioner's convictions after concluding that trial counsel's representation was ineffective because he: (1) pursued self-defense exclusively, rather than pursuing self-defense along with the alternative strategy of convincing the jury to convict Petitioner of the lesser-included offense of attempted voluntary manslaughter, and (2) failed to keep a promise to the jury made during opening statements that Petitioner would testify at trial.   The Court of Criminal Appeals affirmed. We granted the State's application for permission to appeal.   We hold that the courts below erred by concluding that trial counsel performed deficiently.   Accordingly, we reverse the judgment of the Court of Criminal Appeals and remand this case for reinstatement of Petitioner's convictions.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the
Court of Criminal Appeals Reversed; Remanded**

CORNELIA A. CLARK, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; Mark A. Fulks, Senior Counsel; David H. Findley, Senior Counsel; Lawrence Ray Whitley, District Attorney General; Charles Ronald Blanton, Assistant District Attorney General; and Bryna Landers Grant, Assistant District Attorney General, for the Appellant, State of Tennessee.

Gregory D. Smith, Clarksville, Tennessee, for the Appellee, Henry Zillon Felts.

**OPINION**

This case arises out of a May 5, 2003 altercation between Petitioner, his ex-wife, Pam Felts, and her male friend, Kent Miller, the victim. The altercation occurred at Ms. Felts' home. When Petitioner entered the home with a pistol, Mr. Miller hit Petitioner with a baseball bat, and Petitioner fired the gun several times, severely injuring Mr. Miller. The following in-depth summary of the proof offered at trial and at the post-conviction hearing is necessary to evaluate the issues presented in this appeal.

*Proof at Trial*

The prosecution's proof at Petitioner's two-day trial showed that Ms. Felts and Petitioner divorced in late 1999 or early 2000, but their romantic and sexual relationship—"a roller coaster ride"—continued after the divorce. They agreed to see other people in September 2002, and Ms. Felts met Mr. Miller in November 2002. Both had children from previous marriages, and their relationship developed into casual dating, which usually included their children. Ms. Felts occasionally invited the Millers to her home, but each time Petitioner learned of the visit, and he either called Ms. Felts or drove around her neighborhood, resulting in Ms. Felts becoming upset and the Millers leaving.

In January 2003, Petitioner and Ms. Felts resumed their volatile relationship. Although he maintained a separate residence in Mt. Juliet, Petitioner began staying at Ms. Felts' home, usually from Thursday through Monday. Petitioner paid Ms. Felts $500 per month rent, which was due on the fifth day of each month. This arrangement continued into late January or early February 2003, when Ms. Felts was arrested for domestic assault for threatening Petitioner with a gun, at which point she required Petitioner to move out and she changed the locks on the residence.

This separation was short-lived, however. Petitioner resumed staying with Ms. Felts, again paying $500 per month rent. Ms. Felts also continued her friendship with Mr. Miller, who was pursuing a romantic relationship with her. Not surprisingly, Petitioner did not approve of their relationship. In April 2003, Petitioner left several phone messages warning Mr. Miller to stay away from Ms. Felts and advising Mr. Miller not to meddle in his relationship with Ms. Felts. On April 28, 2003, Petitioner called Mr. Miller and left a message: "Mother f- -ker, you have f- -ked up." While Ms. Felts testified that Mr. Miller had also threatened Petitioner during "heated arguments" over the telephone, she could recall few specifics. But, Ms. Felts recalled Mr. Miller boasting that "[Petitioner's] old and short and I could take him" in a fist fight.

On Friday, May 2, 2003, Ms. Felts again decided to end her relationship with Petitioner, but she did not tell Petitioner of her decision. Rather, she removed Petitioner's belongings from her house, placing them on the porch. Ms. Felts spent most of the weekend with Mr. Miller. When Petitioner called on Sunday, May 4th, Ms. Felts told him she was ending their relationship. In order to convince Petitioner she had begun a "dating, romantic type situation," Ms. Felts and Mr. Miller devised a plan to leave Mr. Miller's vehicle in her driveway overnight. Although Mr. Miller did not spend the night, Ms. Felts knew Petitioner would see the vehicle and believe Mr. Miller had spent the night.

Petitioner arrived at Ms. Felts' home early on Monday, May 5th. He repeatedly called her from outside, but she ignored him. Eventually, Ms. Felts agreed to talk with Petitioner if he would leave and come back at 1:00 p.m. When Petitioner left, Ms. Felts called Mr. Miller, asking him "to get his car out of here now." Not long after Mr. Miller arrived to retrieve his vehicle, Petitioner called, and Ms. Felts handed Mr. Miller the phone to prove to Petitioner that Mr. Miller was actually present at her home. Ms. Felts did not hear the ensuing conversation, but she heard Mr. Miller laugh. When he handed the telephone back to her, Petitioner said, "I guess he is there." Ms. Felts then saw Petitioner pull into her driveway in his truck. Mr. Miller heard someone banging on the kitchen door, and he saw Petitioner through the blinds and realized he had a gun.

Petitioner entered the house, using a key to unlock the kitchen door. Ms. Felts heard Mr. Miller ask her to "call the police" or "do it," as he retreated to the living room. With the gun in hand, Petitioner walked quickly past Ms. Felts and proceeded toward the living room. Mr. Miller picked up a baseball bat he had previously placed in the living room "just in case" and "surprised" Petitioner by striking him in the head as he walked through the living room door. Ms. Felts, who was behind Petitioner, testified that "the next thing [she] saw was [Mr. Miller], and he was hitting [Petitioner] over the head." Ms. Felts recalled that Mr. Miller struck Petitioner "three times" in rapid succession. Petitioner was "stunned or dazed" and "fell to the ground." Ms. Felts observed Mr. Miller preparing to strike Petitioner again, but then "they went out of [her] view." She heard "scuffling noises" followed quickly by a gunshot. She recalled that "[Mr. Miller] was on top. He was standing up and [Petitioner] was down the last time I saw them."

After the first bullet struck Mr. Miller in the chest, he attempted to swing the bat at Petitioner's knees, but collapsed. Petitioner fired the gun several times, hitting Mr. Miller four more times. When paramedics arrived, Mr. Miller was conscious, but he lapsed into a coma and remained comatose for three and a half weeks. Petitioner was also injured, with a bleeding and badly swollen laceration above his left eye and a contusion to his left knee.

3

A police detective investigating the incident testified that, near the curb of Ms. Felts' property, he recovered a 9-mm pistol containing three live rounds and one shell casing stuck between the slide, indicating the gun had jammed. Six more shells were recovered from inside the house. Just inside Ms. Felts' kitchen door, the officer found a set of keys, including a key to Ms. Felts' door and another to Petitioner's truck.

A police sergeant who interviewed Petitioner at the scene testified Petitioner said "he had had to shoot the man in the house," explaining that "he had been staying there with his ex-wife, and the man had assaulted him with the baseball bat, and he had to shoot him." Another prosecution witness testified on cross-examination that he had seen Petitioner after the confrontation "rolling around on the ground and screaming as if he were in pain." According to this witness, Petitioner said "he went to his ex-wife's home and a man hit him with a baseball bat in the head and then he shot the man." A police detective who interviewed Petitioner at the hospital after the incident testified Petitioner declined to make a formal statement, but said that "he wasn't a killer; he didn't mean to shoot [Mr. Miller]; he didn't want to shoot him; that [Mr. Miller] came at him with a bat." Additionally, Ms. Felts testified that she did not believe Petitioner intended to shoot anyone when he came in the house, but rather wanted attention. Ms. Felts also said that Mr. Miller could have escaped through an unlocked door, rather than waiting for Petitioner to come inside.

The police detective who took Mr. Miller's statement five weeks after the incident testified that Mr. Miller admitted placing the bat in the living room "just in case," but explained, "I was never going to go out after him with anything, but if he came in after me, I would be able to defend myself." Mr. Miller also said he had hit Petitioner with the bat "just once," a statement the police detective believed to be false based on Petitioner's injuries.

At trial, Mr. Miller testified that he had "surprised" Petitioner with a blow to the head from the bat and admitted he did not hold back when he swung the bat at Petitioner. Mr. Miller agreed he had struck Petitioner at least twice, once on the head and again on the leg, leaving a red mark on Petitioner's thigh and a bruise on his shin. A third swing of the bat knocked a hole in the wall of Ms. Felts' home. Mr. Miller also agreed Petitioner shot him only after he hit Petitioner in the head with the bat.

During closing argument, trial counsel argued vigorously that, absent a valid notice of eviction, Petitioner, as a paying tenant, had not committed burglary when he entered Ms. Felts' home. Conceding that Petitioner should not have brought a gun, trial counsel nonetheless contended that, as a paying tenant, Petitioner had every right to enter the house. Because Mr. Miller had started the fight by hitting Petitioner with a bat, Petitioner, under attack in his own residence, had lawfully shot Mr. Miller in self-defense. Trial counsel

repeatedly stressed Petitioner's emotional turmoil on the day of the altercation, stating, "however stupid, reckless, and silly it was to get so torn up over this woman, he loses his head." Trial counsel also argued that Petitioner's actions failed to support a finding of premeditation.

The jury convicted Petitioner of aggravated burglary and attempted first degree murder, rejecting the lesser-included offenses of attempted second degree murder and attempted voluntary manslaughter. The trial court sentenced Petitioner to concurrent sentences of twenty-one years on the attempted first degree murder conviction and three years on the aggravated burglary conviction. The convictions and sentences were affirmed on appeal. State v. Felts, No. M2005-01215-CCA-R3-CD, 2006 WL 2563374 (Tenn. Crim. App. Aug. 25, 2006), perm. app. denied (Tenn. Dec. 18, 2006). Petitioner timely filed a petition for post-conviction relief on September 24, 2007. Three amendments to the post-conviction petition followed, on November 9, 2007, December 17, 2007, and October 14, 2008.

*Post-Conviction Proceeding*

Petitioner testified at the post-conviction hearing and admitted that he had misdemeanor convictions for domestic violence against Ms. Felts, but stressed that she also had a misdemeanor conviction for domestic violence against him. He explained their relationship as follows: "I was addicted to her, especially sexually, and neither one of us would let go."

Around Christmas of 2002, after a few months apart, Ms. Felts told Petitioner that she wanted him to come see her that night, but that another man would be at her home. She promised that the other man would be gone by 10:00 p.m. and asked Petitioner to arrive then. Petitioner was annoyed to see a strange car in Ms. Felts' driveway at 10:00 p.m., however, so he called Ms. Felts and circled around the block. As the car left, Petitioner maneuvered his truck to shine its lights on the driver, Mr. Miller. Petitioner admitted, "I wanted him to see me pulling in the driveway."

Petitioner and Ms. Felts soon made a new living arrangement: she gave him a key to stay at her house, and he would pay her $500 per month rent, due by the fifth day of each month. However, Ms. Felts unilaterally broke off the agreement when she took back the key near the end of January or the beginning of February 2003. They had been fighting again, Ms. Felts had pulled a gun on Petitioner, and he had her arrested. Nevertheless, they soon resumed living together at Ms. Felts' home. She had changed the locks, but Petitioner made himself a key.

5

In the weeks leading up to the shooting, Ms. Felts taunted Petitioner with the possibility of replacing him with Mr. Miller. She frequently challenged Petitioner to prove his love for her by confronting Mr. Miller. When the police checked in on her one day, she blamed Petitioner, unaware that Mr. Miller had sought the intervention. This meddling in their relationship infuriated Petitioner, so he called Mr. Miller and left a message: "Mother f- -ker, you've f- -ked up."

On Friday, May 2, 2003, Petitioner awoke "on top of the world" believing he had turned a corner in his relationship with Ms. Felts. After another argument, though, he returned to find his clothes removed from the house and left on her porch. He came back again the next day, only to see Mr. Miller's car in the driveway. Ms. Felts chided Petitioner for not stopping to confront Mr. Miller: "you're chickenshit; you don't love me; you don't have the guts to stop." Petitioner retorted, "let me catch him there again and see if I don't stop."

Petitioner called Mr. Miller that day, and each man warned the other to stay away from Ms. Felts, who in turn threatened Petitioner by saying, "I don't know what I'm going to do yet, but I'm going to f- -k you up." On May 4th, Petitioner noticed Mr. Miller's vehicle was not in Ms. Felts' driveway, and told her as much, but she retorted that "just because it wasn't don't mean that somebody wasn't here."

On Monday morning, May 5th, Petitioner awoke to a message Ms. Felts had left on his phone Sunday night: "I'm about to do what you need to let go. I'm about to give it what it'll take for us to break up." Petitioner assumed she meant she planned to have sex with Mr. Miller. After his emotional high of Friday morning, Petitioner could not believe the abrupt disintegration of his relationship with Ms. Felts. She ignored his calls, so he drove to her house and was devastated to find Mr. Miller's vehicle in the driveway.

Petitioner left but returned again, yelling from outside at Mr. Miller, who he thought was in the house. Ms. Felts told Petitioner to come back later and she would talk to him. En route a third time, Petitioner asked to meet Ms. Felts down the street to avoid a confrontation with Mr. Miller, but she refused, telling him, "You don't have the guts to do anything. You're not going to come in."

Petitioner called and knocked, but Ms. Felts ignored him. She finally answered the phone, flirted with him, and agreed to talk at 1:00 p.m. Around 12:30, Petitioner realized that Mr. Miller had not been in the house. He called Ms. Felts, told her as much, and headed off to work. Ms. Felts then put Mr. Miller on the phone. Petitioner turned around and drove back again—for the fourth time that day.

6

On the way, Petitioner talked on the phone with Ms. Felts, who asked him if he had a key. He lied and said he did not. As he pulled into the driveway, Petitioner asked Ms. Felts, "if I come in there, will it prove that I love you?" She taunted him by saying that he would not do anything, that he did not love her. Petitioner testified, "I knew there was a pistol in the console of my truck, and something in my gut just told me I needed to take my gun, . . . I wasn't going in there to harm anyone. I was scared. I didn't want to go, but if I didn't go in there, I was for sure going to lose her."

Petitioner, who knew that Mr. Miller had called him a "fat, out-of-shape old man," did not want to start a fight, but he thought a gun would end one. He testified, "I'll admit I even pictured in my mind putting him out of the house with a gun held on him." While still on the phone, Petitioner told Ms. Felts, "I was coming in there and that all three of us was going to talk," before opening the door with his key. As Petitioner entered, he heard Mr. Miller say "do it" as he left the room. Fearing a trap, Petitioner took the gun from his pocket, dropped his keys, and pursued Mr. Miller.

As he went through a doorway, he saw a bat just before it struck him over the left eye, then again on his left knee. Fearing for his life, Petitioner brought the gun up and fired one shot, which he thought would end the fight, but Petitioner felt several more blows to his knee, chest, and arms. When Mr. Miller jumped on top of him, he testified, "I drug the gun up and just started firing."

Petitioner lost consciousness but awoke to find Mr. Miller lying on the floor. Realizing he had shot a man, Petitioner left the house, put his hands in the air, and yelled for help. He laid the gun down in the yard and went to several neighbors, asking them to call for an ambulance and the police. When the paramedics arrived, he told them to help the man in the house.

Asked during the post-conviction hearing whether he could have given this testimony at trial, Petitioner said: "I don't think I could have done it without getting emotional but, yes, sir." Petitioner understood that he would testify only if the trial went badly. After a lunch break on the second day of trial, trial counsel informed Petitioner that he would not testify.[1] While no reason was given, Petitioner acknowledged his frustration in preparing to testify. Trial counsel repeatedly asked him "only one question" in practice sessions, "and he didn't like my answer." (Asked later by the court, Petitioner said the question he answered

_____

[1]On direct appeal, Petitioner argued that his waiver of his right to testify was not made knowingly and voluntarily. State v. Felts, No. M2005-01215-CCA-R3-CD, 2006 WL2563374, at *7. The Court of Criminal Appeals rejected his contention. Id. at *8. The Court concluded that Petitioner made the decision not to testify after thorough discussion with his attorneys. Id.

unsatisfactorily was: "Why did I go in that house with the gun?") He could not recall discussing attempted voluntary manslaughter or self-defense with trial counsel.

David Raybin, a criminal defense lawyer, testified on Petitioner's behalf at the post-conviction hearing. Mr. Raybin distinguished between voluntary manslaughter, second degree murder, and first degree murder. All require proof of a knowing or intentional killing; first degree murder requires proof of premeditation, while proof of adequate provocation is needed for voluntary manslaughter. Mr. Raybin classified the latter, with respect to murder, as a "defense." Asked to distinguish between voluntary manslaughter and self-defense, Mr. Raybin explained: "There is no difference. Self-defense is a complete defense to first degree murder; so is . . . voluntary manslaughter."

Mr. Raybin faulted trial counsel for failing to prepare—and pursue—a strategy of convincing the jury to convict Petitioner of the lesser-included offense of attempted voluntary manslaughter. While he otherwise applauded trial counsel's thorough preparation, Mr. Raybin could find nothing in trial counsel's file to indicate that attempted voluntary manslaughter had even been considered. In particular, Mr. Raybin pointed to an undated document listing "Possible Defenses" to the charged crimes of "Burglary and Criminal Intent to Commit Criminal Homicide" alongside references to the corresponding sections of the Tennessee Code. "Duress" and "Self-Defense" were listed as possible defenses, but attempted voluntary manslaughter was not listed.

Mr. Raybin agreed that self-defense could be argued as a backup, but "in my view, pure self-defense just simply could not fly in this case in plain terms." Because Petitioner entered the house with a gun and grievously wounded the victim, Mr. Raybin believed the jury would inevitably hold Petitioner accountable. Mr. Raybin opined that counsel had no reasonable choice but to try to minimize the "damage" by persuading the jury that Petitioner's actions fit into the "manslaughter box."

Mr. Raybin opined that trial counsel's strategy of focusing exclusively on self-defense and never mentioning the word "manslaughter" to the jury "departed from the settled standards of practice, that you could try the case exactly the same way, if you will, but put that manslaughter out there first, foremost and always drive the jury into that." Mr. Raybin opined that the jury had to decide between "attempted first-degree murder and nothing."

Mr. Raybin also strongly criticized trial counsel for not calling Petitioner to testify. Because Petitioner had no prior convictions with which the State could impeach him, Mr. Raybin believed Petitioner's testifying had no downside and a huge upside: "It's a credible account; it's consistent with the facts." Finally, Mr. Raybin deemed these errors prejudicial,

because they "deprived [Petitioner] of an opportunity to be convicted of a lesser included offense."

Having shipped Petitioner his entire file, trial counsel had access to few relevant documents in preparation for the post-conviction hearing. However, he recalled that a friend of Petitioner, an attorney, initially contacted him about representing Petitioner at trial. Trial counsel agreed to take the case and worked on it with Petitioner's friend and another attorney who worked with trial counsel. Trial counsel discussed the case with Petitioner many times, and Petitioner also often discussed the case with his attorney-friend, who relayed that information to trial counsel. The defense team "operated on the premise" that they would decide later whether Petitioner would testify. They also discussed "whether the facts that might be established through [Petitioner's] testimony [would come] in from other witnesses to the extent that the jury, as the finder of fact, would know of these facts." The defense team rehearsed Petitioner's testimony repeatedly, testing Petitioner with specific questions to gauge whether he could answer effectively. While trial counsel met with Petitioner many times, he had no recollection of discussing the various strategies available to the defense at trial. For example, he could not recall saying, "here's the self-defense defense; here's a lesser included offense."

Trial counsel "read a great deal" about the law of self-defense in Tennessee while preparing for trial and discussed it "a lot" with the other attorneys. Trial counsel also took a detailed statement from Petitioner and hired a professional photographer to photograph Ms. Felts' home during the investigation to illustrate "what happened" and provide "a narrative that was sympathetic" to Petitioner.

In the end, trial counsel exclusively pursued a self-defense strategy because trial counsel believed that Petitioner had a right to be on the premises when Mr. Miller attacked him. Asked to explain this trial strategy, trial counsel said: "Well, the thing that stands out to my memory is that [Petitioner] was hit full in the face with a baseball bat, and that he attempted to survive by firing his weapon." Under such circumstances, trial counsel did not believe Petitioner formed any criminal intent, but was simply "responding to the situation." Trial counsel also argued that Petitioner could not be guilty of burglarizing his own home and "everybody [had] every reason to think [Petitioner] would [be] there . . . . [T]hey all knew he was going to come there. He lived there, more or less."

Trial counsel could not recall promising the jury during opening statement that Petitioner would testify, but agreed the record of the trial would reflect what occurred. The record shows that, prior to voir dire, the prosecution and the defense were asked to identify witnesses they expected to call so that questions could be posed to potential jurors about their knowledge of or relationship to the potential witnesses. Trial counsel advised the court that

"[Petitioner] is a potential witness." The trial court then told the prospective jurors that the defense "will call as their witnesses the defendant himself [and other witnesses]," indicating Petitioner would definitely testify. However, in preliminary instructions given before any evidence was introduced the trial court instructed the jury: "After the State completes it[s] case-in-chief, the defense will be given an opportunity to present evidence through witnesses and exhibits. A defendant is not required to put on any evidence or to testify."

Later, in opening statements, the *prosecutor* remarked, "Finally during this trial you will hear from [Petitioner]. Now, I have absolutely no idea as to what he will testify to that has not been made known to us. It is up to him to do so." During the defense's opening statement, trial counsel remarked, "[Petitioner] is going to say that he saw the blur of the bat, and he was blinded; that he was being beaten; that he was down on the ground; that he thought he was going to die, and that is when the shots happened."

As the trial began, the defense team continued to probe Petitioner to ascertain whether he could effectively answer anticipated cross-examination questions. As the trial progressed, Petitioner became "extremely anxious and nervous and worried and concerned," which led the defense to prefer to avoid the hazard of cross-examination. And trial counsel explained "there were certain basic contradictions in either things [Petitioner] had said or done that were going to be very difficult to deal with."

The State had already played for the jury audio messages Petitioner left for Mr. Miller and Ms. Felts. Trial counsel testified that "the jury would sort of cringe when those things were played, and I didn't really want to see them cringe anymore." The jury had already heard the tapes, but "I was certain that if [Petitioner] testified that the State would play them again, perhaps repeatedly, and would repeatedly ask him what he meant by certain of the comments."[2] Trial counsel explained, "I think that we anticipated [Petitioner] would testify, but we came to believe that if he testified, it would be a disaster." Additionally, the testimony of Mr. Miller and Ms. Felts had been unexpectedly favorable to Petitioner's case. Specifically, Ms. Felts had "provided a narrative that was sympathetic" to Petitioner, while Mr. Miller had stumbled over his conflicting statements about how he obtained the bat and

---

[2]We may take judicial notice of prior proceedings in the same case, Harris v. State, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) (citing Caldwell v. State, 917 S.W.2d 662, 666 (Tenn. 1996)), and we have done so here. Although the trial record was not introduced at the post-conviction proceeding, it includes a recording of some two dozen messages that Petitioner left on Ms. Felts' answering machine on Sunday, May 4th, and Monday, May 5th, including the following: (1) "I don't want to go to jail. I don't want nobody to get hurt. I don't want no clash to happen. Pam you need to pick up the phone and talk to me or I'm fixing to drop it on your door. And I'm not for a clash."; and (2) "Are you trying to make me come out and jump on him or kill him or somebody get hurt to prove my love to you. Because all the devil you've done is create a dangerous situation."

how many times he struck Petitioner with it. According to trial counsel, Petitioner expressed relief that he would not be testifying.

*Rulings Below*

The post-conviction court concluded that trial counsel had performed deficiently by (1) pursuing self-defense exclusively, rather than pursuing self-defense along with the alternative strategy of convincing the jury to convict Petitioner of the lesser-included offense of attempted voluntary manslaughter, and (2) failing to keep a promise to the jury made during opening statements that Petitioner would testify at trial. The post-conviction court found that "tremendous prejudice" resulted from these deficiencies, and applying State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991), the post-conviction court concluded that these deficiencies had deprived Petitioner of "the opportunity to be convicted of a lesser included offense." Therefore, the post-conviction court granted Petitioner post-conviction relief, setting aside his convictions. The State appealed, and the Court of Criminal Appeals affirmed. Thereafter, we granted the State's application for permission to appeal. For the reasons explained below, we reverse the judgments of the Court of Criminal Appeals and the trial court and reinstate Petitioner's convictions and sentences.

**Standard of Review**

Under Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122 (2006 & Supp. 2011), relief "shall be granted when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Id. § 40-30-103. Petitioners seeking post-conviction relief must prove factual allegations by clear and convincing evidence at an evidentiary hearing. Id. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court is bound by the factual findings of the post-conviction court unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009); Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006); Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Our review of legal issues or mixed questions of law and fact, such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness given to the trial court's conclusions. Finch v. State, 226 S.W.3d 307, 315 (Tenn. 2007); Vaughn, 202 S.W.3d at 115; Fields, 40 S.W.3d at 458.

**Analysis**

*Ineffective Assistance of Counsel*

Article I, section 9 of the Tennessee Constitution provides "that in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel . . . ." Tenn. Const. art. I, § 9. The Sixth Amendment to the United States Constitution provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. These constitutional provisions guarantee a criminally accused the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

To prevail on a claim that counsel's representation "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," Strickland, 466 U.S. at 686, a petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. Id. at 687; Pylant v. State, 263 S.W.3d 854, 868 (Tenn. 2008). Failure to establish either deficient performance or prejudice necessarily precludes relief. Id. at 697; Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

Establishing deficient performance requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687; see also Vaughn, 202 S.W.3d at 116. Counsel's performance is not deficient if the advice given or the services rendered "are within the range of competence demanded of attorneys in criminal cases." Baxter, 523 S.W.2d at 936; see also Strickland, 466 U.S. at 687 ("[T]he proper standard for attorney performance is that of reasonably effective assistance."). In other words, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness" guided by "professional norms" prevailing at the time of trial. Strickland, 466 U.S. at 688; see also Vaughn, 202 S.W.3d at 116; Baxter, 523 S.W.2d at 932-33.

Courts must not measure counsel's performance by "20-20 hindsight." Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). "[A] reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999). In other words, the petitioner must overcome the presumption that, under the circumstances,

counsel's challenged action "might be considered sound trial strategy." <u>Strickland</u>, 466 U.S. at 689.

As the United States Supreme Court emphasized, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." <u>Id.</u> at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Id.</u> at 690-91; <u>see also</u> <u>Baxter</u>, 523 S.W.2d at 935-36 (recognizing that counsel should investigate all apparently substantial defenses); <u>Hellard</u>, 629 S.W.2d at 9 (emphasizing that a reviewing court should not second guess counsel's strategic and tactical decisions). Counsel's duty is "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." <u>Strickland</u>, 466 U.S. at 691. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," and "what investigation decisions are reasonable depends critically on such information." <u>Id.</u> "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." <u>Id.</u> The fact that a particular strategy or tactical decision failed does not by itself establish deficiency. <u>Goad</u>, 938 S.W.2d at 369.

To prove the second part of an ineffective assistance of counsel claim—that counsel's deficiency resulted in prejudice to the defense—a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694; <u>see also</u> <u>Vaughn</u>, 202 S.W.3d at 116; <u>Goad</u>, 938 S.W.2d at 370. Because a petitioner must establish both deficiency and prejudice to prevail on a claim of ineffective assistance of counsel, a court need not address both of these concepts if the petitioner fails to demonstrate one of them. <u>Strickland</u>, 466 U.S. at 697; <u>Goad</u>, 938 S.W.2d at 370.

A. Deficient Performance

*1. Failure to Seek an Attempted Voluntary Manslaughter Conviction*

The State argues that the courts below evaluated trial counsel's performance by hindsight and engaged in the second-guessing prohibited by <u>Strickland</u> and <u>Hellard</u> when they concluded that counsel performed deficiently by choosing to pursue self-defense exclusively, rather than also pursuing the alternative strategy of convincing the jury to

13

convict Petitioner of the lesser included offense of attempted voluntary manslaughter. The State maintains that counsel's decision to pursue self-defense exclusively was a reasonable, strategic choice made after a thorough investigation of the law and facts and as such is "virtually unchallengeable." Strickland, 466 U.S. at 690.

In contrast, Petitioner asserts that trial counsel's decision to pursue self-defense exclusively is not a strategic choice entitled to deference because trial counsel never considered or investigated the alternative strategy. In support of this argument, Petitioner points out that trial counsel conceded at the post-conviction hearing that he could not remember why he did not actively pursue this alternative strategy. Petitioner also relies upon the testimony of his expert that nothing in trial counsel's file shows that he ever legitimately explored the alternative strategy as a possible means of Petitioner avoiding a conviction for attempted first degree murder. Petitioner contends that the factual circumstances in this case required trial counsel to advance this lesser-included offense to attempted first degree murder[3] instead of exclusively seeking a full acquittal based on self-defense. Conversely, Petitioner argues that his trial counsel unreasonably pursued a strategy of self-defense,[4] because Petitioner provoked the altercation by entering the house with a gun and the use of force against another is generally not justified if the person using force provoked the altercation. Tenn. Code Ann. § 39-11-611(d).

We agree with the State that the courts below erred in concluding that counsel performed deficiently by exclusively pursuing a theory of self-defense. Trial counsel spent over 100 hours on this case, worked with two other attorneys, discussed the case with

---

[3]State v. Dominy, 6 S.W.3d 472, 477 n.9 (Tenn. 1999); see also Burns, 6 S.W.3d at 466.

[4]Self-defense is codified at section 39-11-611 of the Tennessee Code, which, at the time of the offense, stated in relevant part:
> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.
> . . .
> (d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless
> (1) The person abandons the encounter or clearly communicates to the other the intent to do so; and
> (2) The other nevertheless continues or attempts to use unlawful force against the person.

Tenn. Code Ann. § 39-11-611(a), (d) (2003).

14

Petitioner many times, and generated an extensive trial memorandum, which included a comprehensive statement from Petitioner detailing his tumultuous relationship with Ms. Felts, their arguments the weekend before the shooting, his attempts to work things out, and the confrontation with the victim that resulted in these charges. This memorandum also listed possible statutory defenses, including duress and self-defense. Trial counsel read "a great deal" about the law of self-defense in Tennessee and discussed it "a lot" with his co-counsel. Trial counsel also had the crime scene photographed, intending to use the photographs to illustrate the incident and provide a sympathetic narrative for Petitioner. Ultimately, based on Petitioner's statement and his investigation of the incident, trial counsel settled on self-defense because Petitioner was paying rent to live in Ms. Felts' home, had not been evicted, and was attacked in Ms. Felts' home with a baseball bat before shooting the victim. Concluding that Petitioner had no criminal intent when he entered Ms. Felts' home and simply responded to the victim's attack, trial counsel pursued self-defense exclusively.

While Petitioner's expert at the post-conviction hearing agreed that self-defense was appropriate under the circumstances of this case, he faulted trial counsel for failing to pursue the alternative strategy of convincing the jury to convict Petitioner of attempted voluntary manslaughter, describing this alternative strategy as a complete defense to the charged offense. Petitioner's expert's testimony that trial counsel never considered the "defense" of attempted voluntary manslaughter was premised upon a single document from trial counsel's file that listed only "Duress" and "Self-Defense" as "Possible Defenses" to "Burglary and Criminal Attempt to Commit Criminal Homicide." This premise is faulty, however, because attempted voluntary manslaughter is not a defense; it is a lesser-included offense. Trial counsel had no reason to list it as a possible defense to the charges, and his failure to do so does not support a conclusion that trial counsel failed to consider the alternative strategy Petitioner's expert proposed.

Furthermore, the record on appeal refutes the testimony of Petitioner's expert that nothing in the case file indicates trial counsel considered the alternative strategy. Although trial counsel undeniably focused on self-defense, his file (admitted as an exhibit at the post-conviction hearing) includes a summary of an opinion addressing attempted voluntary manslaughter,[5] which indicates trial counsel's awareness and consideration of this lesser-

---

[5]State v. Mason, 2004 WL 1114581, 39 TAM 26-2, No. M2002-01709-CCA-R3-CD (Tenn. Crim. App. May 19, 2004)). The Court of Criminal Appeals held in Mason that the trial court properly instructed the jury on attempted voluntary manslaughter, where the defendant had attacked the deputy who transported him for medical treatment, because the humiliation of being handcuffed and shackled in a public place could be viewed as provocative by a sympathetic jury. Id. The phrase "attempted voluntary manslaughter" is underlined in the photocopy of this Tennessee Attorneys Memo summary of Mason in trial counsel's file.

included offense as a potential alternative defense strategy. The proof presented at the post-conviction hearing does not establish that trial counsel's investigation was inadequate.

Trial counsel's decision to pursue self-defense exclusively was reasonable under the circumstances of this case. Petitioner was charged with both aggravated burglary and attempted first degree murder. Proof relevant to self-defense—that Petitioner paid Ms. Felts rent and had a right to be present at her home—was also relevant to negate an element of aggravated burglary—that Petitioner entered the house *without* Ms. Felts' effective consent.[6] By comparison, the proposed alternative strategy of convincing the jury to convict Petitioner of attempted voluntary manslaughter would have aided the prosecution in establishing one of the elements of aggravated burglary—that Petitioner entered Ms. Felts' home and committed or attempted to commit a felony, theft, or assault. Id. § 39-14-402(3).

If successful, the self-defense strategy trial counsel pursued would have resulted in a complete acquittal of the attempted first degree murder charge, see id. § 39-11-203(d), and likely would have resulted in an acquittal of the aggravated burglary charge by negating an essential element of the offense. In contrast, the alternative strategy, if successful, would have resulted in Petitioner's conviction of at least one criminal offense, attempted voluntary manslaughter, and would have increased the likelihood of his conviction on the aggravated burglary charge.

Furthermore, while there are factual situations in which self-defense and attempted voluntary manslaughter are entirely consistent defense theories,[7] the two theories are not entirely consistent in the context of this case.

Establishing a *reasonable* belief of imminent danger of death or serious bodily injury is key to successfully establishing self-defense. See id. § 39-11-611(a). "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation *sufficient to lead a reasonable person to act in an irrational manner*." Id. § 39-13-211(a) (emphasis added). A reasonable attorney could conclude that it would have been difficult to argue *both* that Petitioner intentionally or knowingly attempted to kill the victim because his passion had been so provoked as to cause a

_____

[6]At the time of Petitioner's trial (and at present), aggravated burglary required proof that Petitioner entered Ms. Felts' home "without the effective consent of the property owner." Tenn. Code Ann. §§ 39-14-402 to -403 (2010).

[7]See United States v. Scafe, 822 F.2d 928, 932 (10th Cir. 1987) (noting that "self[-]defense and voluntary manslaughter instructions are not always inconsistent") (citing Stevenson v. United States, 162 U.S. 313, 322-23 (1896)). Indeed, we can imagine a scenario in which these theories would neatly dovetail—such as a husband who finds his wife in bed with a man *who is armed and about to kill him*.

reasonable person to act irrationally *and* that Petitioner had no intent to harm the victim when he entered Ms. Felts' home lawfully and only shot the victim because of his reasonable belief that a danger of imminent death or serious bodily harm required his use of deadly force. Pursuing both of these theories would have required trial counsel to argue irrationality and reasonableness at the same time. While counsel may reasonably decide as a matter of strategy to present alternative, even inconsistent defense theories to the jury, see, e.g., Dowell v. State, No. W2007-02814-CCA-R3-PC, 2008 WL 4117960 (Tenn. Crim. App. Sept. 5, 2008),[8] we have never held, and decline to hold now, that trial counsel *must* pursue inconsistent defense theories to provide constitutionally effective representation.[9]

We hold that trial counsel was not deficient for choosing a single, reasonable defense theory to the exclusion of another plausible, but inconsistent theory. See United States v. Layton, 855 F.2d 1388, 1420 (9th Cir. 1988) ("We have repeatedly refused to second-guess counsel's strategic decision to present or to forego a particular theory of defense when such decision was reasonable under the circumstances."); Johnson v. State, 612 So.2d 1288, 1296 (Ala. Crim. App. 1992) ("Defense counsel made a reasoned, strategic decision not to argue inconsistent, alternative theories of defense . . . ."); Jackson v. State, 701 S.E.2d 481, 486 (Ga. App. 2010) ("'[G]enerally, counsel's decision as to which theory of defense to pursue is considered strategic and cannot serve as the basis for an ineffective assistance claim.'" (quoting McGee v. State, 589 S.E.2d 333, 335 (Ga. App. 2003))); Anfinson v. State, 758 N.W.2d 496, 501 (Iowa 2008) ("[R]easonable strategic considerations may justify the rejection of one theory of defense in favor of another theory reasonably perceived by counsel

---

[8]In Dowell, for example, the petitioner told police that he shot the victim in self-defense, and trial counsel found no grounds for suppressing this statement. 2008 WL 4117960, at *2. Before trial, however, an eyewitness came forward willing to testify that another person shot the victim. Id. Facing the dilemma of either withholding exculpatory evidence or arguing inconsistent defenses, trial counsel called the eyewitness to testify after the State had presented defendant's statement and attempted to reconcile the conflicting accounts. Id. At the post-conviction hearing, counsel explained that the confession gave the jury an opportunity to consider self-defense without exposing the petitioner to damaging cross-examination. Id. at *5. In denying relief on the claim of ineffective assistance of counsel, the Court of Criminal Appeals agreed with the trial court's conclusion that the petitioner failed to establish counsel performed deficiently by presenting inconsistent defense theories. Id.

[9]Similarly, the Court of Criminal Appeals has repeatedly held that defense attorneys are not incompetent for failing to request jury instructions inconsistent with a chosen defense theory. See, e.g., State v. Utley, No. W2006-01486-CCA-R3-CD, 2007 WL 1515145, at *4 (Tenn. Crim. App. May 23, 2007) (intoxication instruction inapposite as defendant denied any involvement with theft); Watson v. State, No. W2005-02324-CCA-R3-PC, 2007 WL 1215057, at *6 (Tenn. Crim. App. Apr. 20, 2007) (sexual battery instruction inapposite as defendant denied touching the victim at all); Watkins v. State, No. M2008-02098-CCA-R3-PC, 2010 WL 4812762, at *8 (Tenn. Crim. App. Nov. 23, 2010) (second degree murder instruction inapposite as defendant denied knowledge that killings would occur).

to be in the accused's best interest."); Francis v. State, 183 S.W.3d 288, 300 (Mo. Ct. App. 2005) ("Provided the decision is reasonable, a deliberate and informed choice to pursue one defense over another is a matter of trial strategy that cannot form the basis of a claim of ineffective assistance of counsel."); Marlow v. State, 886 S.W.2d 314, 317 (Tex. App. 1994) ("In the present case, appellant had several defensive theories available to him, and trial counsel chose to proceed with only one of those, namely, self-defense. This is within his prerogative as a matter of trial strategy."); Brown v. Commonwealth, 702 S.E.2d 582, 589 n.4 (Va. Ct. App. 2010) ("This Court will not interfere with a party's strategic choice in not pursuing certain theories of defense."). The courts below erred in holding that trial counsel performed deficiently by pursuing self-defense to the exclusion of attempted voluntary manslaughter.

### 2. Failure to Fulfill Promise to Jury that Petitioner Would Testify

The courts below also held that trial counsel provided ineffective representation because he promised the jury Petitioner would testify and later advised Petitioner not to testify, resulting in an unfulfilled promise to the jury.

As previously stated, prior to voir dire, trial counsel advised the trial court only that "[Petitioner] is a potential witness." The trial court then incorrectly told prospective jurors the defense "will call as their witnesses the defendant himself [and other witnesses]," indicating Petitioner would testify. In preliminary instructions given before the introduction of evidence, the trial court instructed the jury that "[a] defendant is not required to put on any evidence or to testify." Later in opening statements, the *prosecutor* remarked, "Finally during this trial you will hear from [Petitioner]. Now, I have absolutely no idea as to what he will testify to that has not been made known to us. It is up to him to do so."[10] Trial counsel then gave the defense's opening statement, saying, "[Petitioner] is going to say that he saw the blur of the bat, and he was blinded; that he was being beaten; that he was down on the ground; that he thought he was going to die, and that is when the shots happened."

The State argues that trial counsel's remarks did not amount to a clear and unequivocal promise that Petitioner would testify and that these remarks may be reasonably understood as a prediction of the evidence to come, which was expected to include

---

[10]A prosecutor's direct reference to a criminal defendant's failure to testify in his own defense is a violation of the Fifth Amendment privilege against compelled self-incrimination. Griffin v. California, 380 U.S. 609 (1965). "[I]ndirect references on the failure to testify also can violate the Fifth Amendment privilege." Byrd v. Collins, 209 F.3d 486, 533 (6th Cir. 2000). Prosecutors who choose to comment in opening statements upon a defendant's potential trial testimony should be mindful of the boundaries imposed by the Fifth Amendment.

Petitioner's extrajudicial statements and his experiences as perceived by other witnesses. The State also correctly points out that the facts trial counsel told the jury Petitioner would "say" actually were introduced at trial through other witnesses.[11]  Petitioner responds that trial counsel's remarks amounted to a promise and that the courts below properly applied State v. Zimmerman, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991), to the facts of this case and correctly granted relief for ineffective assistance of trial counsel.

In the factual context of this case, where the trial court and the prosecution had already remarked that Petitioner would definitely testify and trial counsel failed to object to or correct these remarks, we agree with Petitioner that trial counsel's remark about what Petitioner would "say" amounted to a promise that Petitioner would testify.  While we decline to fault trial counsel for the trial court's and the prosecution's comments, we agree that trial counsel's remarks essentially "promised" the jury that Petitioner would testify. Thus, we must decide whether trial counsel performed deficiently when he promised the jury that Petitioner would testify and later advised Petitioner not to testify, resulting in an unfulfilled promise.

This Court considered a similar claim of ineffective assistance of counsel in Butler v. State, 789 S.W.2d 898 (Tenn. 1990).  There, the defendant faced a second trial after the first jury deadlocked.  Id. at 899.  The defendant testified at the first trial, but his testimony opened the door to very damaging rebuttal proof.  During voir dire at the second trial, defense counsel made comments suggesting the defendant would testify, but the defendant was not called to testify, and the second jury convicted the defendant as charged.  Id.  The defendant later sought post-conviction relief, asserting trial counsel had been ineffective for failing to call him as a witness after stating to the jury that the defendant would testify.  Id. In concluding that trial counsel had not performed deficiently, this Court stated:

> During cross-examination of Petitioner at the first trial the State had also elicited admissions that he had prepared and initiated the sending of form letters to the victim's family and neighbors requesting the victim take psychiatric and polygraph tests, suggesting that the victim had been having an affair with a married man, and remarking that for the family's safety he hoped the victim was telling the truth.  The admission of these letters remained a

---

[11]The victim testified he "surprised" Petitioner when he struck the first blow with the bat.  Ms. Felts testified Petitioner appeared "stunned or dazed" from the three blows the victim inflicted in rapid succession and that Petitioner "fell to the ground."  Both Ms. Felts and the victim testified the victim struck Petitioner first and that Petitioner shot the victim after being struck with the bat.  Three witnesses, two of whom were police officers, testified that Petitioner said he had to shoot the victim because the victim attacked him with a baseball bat.

threat to Petitioner upon the second trial. From this it can be seen that defense counsel's decision to forego Petitioner's testimony at the second trial did not violate the standards of Baxter v. Rose and/or Strickland v. Washington. *This was an informed tactical decision which will not be second-guessed by this Court.* See generally Hellard v. State, 629 S.W.2d 4, 9-12 (Tenn. 1982).

Petitioner suggests that counsel's statements to prospective jurors during voir dire indicating that Petitioner would testify coupled with the failure to put Petitioner on the witness stand constitute ineffective assistance of counsel. These statements were not extensive. They did not state as a certainty nor were they a promise that the Petitioner would testify. Compare Anderson v. Butler, 858 F.2d 16 (1st Cir.1988). At times, in fact, counsel indicated that Petitioner might not testify. As a witness at the post-conviction hearing, Petitioner's trial counsel stated that he had deliberately mentioned that Petitioner might testify in order to trick the prosecution into withholding from its case in chief damaging evidence, such as the threatening letters sent to the victim's family and the "experiments" conducted with other students. The State's handling of these matters at the second trial plainly shows the success of this strategy. *Like the decision not to present Petitioner as a witness, counsel's references on voir dire to Petitioner's possible testifying was a tactical decision and did not deprive Petitioner of his constitutional right to effective assistance of counsel.*

Butler, 789 S.W.2d at 900-01 (emphasis added).

One year later, the Court of Criminal Appeals addressed a similar claim of ineffective assistance of counsel in State v. Zimmerman, 823 S.W.2d 220 (Tenn. Crim. App. 1991). Lead counsel in Zimmerman chose a defense of "battered wife syndrome" to second degree murder and authorized associate counsel to tell the jury during opening statement that it would hear from the defendant and a clinical psychologist. Id. at 221-22. However, at the conclusion of the prosecution's proof, lead counsel inexplicably advised the defendant not to testify, over the private objection of associate counsel. Id. at 222. Believing an acquittal was impossible, lead counsel decided to "shut down" the defense. Id. at 224-25. Neither the psychologist nor other scheduled defense witnesses were called to testify. Id. at 222. Acting on the advice of lead counsel, the defendant also did not testify. Id. Lead counsel also "forgot" to introduce a stipulation as to the victim's blood-alcohol level at the time of the offense. Id. at 225. During closing argument, the prosecutor reminded jurors of the defense's "smoke screen" opening statement. Id. at 225-26. Because associate counsel "couldn't face the jury," lead counsel gave the final closing argument and referred to facts the defense had obviously meant for the jury to consider, but which had not been introduced

into evidence at trial.[12]  Id. at 226.  The Court of Criminal Appeals held "that the efforts of trial counsel were deficient, not necessarily with respect to preparation or investigation, but by the peremptory abandonment of the pre-established and reasonably sound defense strategy—providing for the testimony of the defendant, a psychologist, certain stipulated proof, and supportive witnesses . . . ."  Id. at 224.  The Court of Criminal Appeals rejected the State's argument that trial counsel's decision to abandon its promised course of defense was reasonable because the defendant was a very risky witness and because there were inconsistencies in her explanation of the events, explaining:

> While those assertions may be so, nothing changed during the course of the trial with regard to either the pre-trial statements she had made to officers or the defendant's ability to articulate her defense.  In other words, *there appears to have been no basis for the sudden change in strategy*.  Those inconsistencies were just as apparent during the opening statement as they were at the conclusion of the state's proof.

Id. at 226 (emphasis added).  In reversing the conviction and remanding for a new trial, the court held that the "cumulative effect" of trial counsel's abandonment of the promised defense strategy, his failure to present witnesses and other relevant evidence, and his failure to present the defendant's testimony, deprived the jury of a "reasonable opportunity to consider a lesser degree of homicide."  Id. at 227.

Like the Court of Criminal Appeals in Zimmerman, courts in other jurisdictions have also focused upon whether developments during the course of the trial prompted legitimate changes in strategy when addressing a claim of ineffective assistance of counsel based on an unfulfilled promise that a defendant would testify.  In Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002), trial counsel initially decided to present the defendant's testimony as the centerpiece of the defense, and clearly communicated this decision to the jury in opening statements.  However, trial counsel subsequently advised the defendant not to testify.  Id. The Circuit Court determined that trial counsel's opening statements, in conjunction with his decision to advise his client not to testify, constituted deficient performance in the absence of unforeseeable events warranting a change in trial strategy.  Id.  In People v. Briones, 816 N.E.2d 1120, 1125 (Ill. App. Ct. 2004), trial counsel told the jury the defendant would testify, but later changed her strategy and did not call the defendant as a witness.  Because trial counsel was unable to show either that the defendant had decided not to testify or that, because of unexpected events, sound trial strategy required her to break her promise that the defendant would testify, the court found trial counsel's performance deficient.  Id.  Similarly,

---

[12]The trial judge sustained the State's objection to lead counsel's reference to a protective order the defendant had obtained against the victim just days before the killing.  Id. at 226.

21

in United States ex rel. Hampton v. Leibach, 347 F.3d 219, 257 (7th Cir. 2003), trial counsel told the jury during opening statements that the defendant would testify and that evidence would be presented showing the defendant was not in a gang. However, trial counsel presented neither the defendant's testimony nor evidence showing the defendant was not in a gang. Id. The court found that, because no "unforeseeable events" had influenced trial counsel's decision not to present the promised evidence, trial counsel performed deficiently. Id.

Zimmerman and decisions from other jurisdictions recognize, either explicitly or implicitly, that developments in the course of a trial will often prompt, indeed necessitate, legitimate changes in strategy. See Anderson v. Butler, 858 F.2d 16, 19 (1st Cir. 1988) (recognizing that a change in trial strategy is not ineffective assistance of counsel and citing cases supporting that proposition). Given the potential that trial developments may require changes in strategy, defense attorneys should be cautious about promising to present specific witnesses.[13] See, e.g., Guarino, 293 F.3d at 28 (noting that counsel's decision not to call the defendant may not have been ineffective assistance of counsel had counsel not made a specific promise in opening statement); Anderson, 858 F.2d at 18 (holding that even if proper under normal circumstances, "it was inexcusable to have given the matter so little thought at the outset as to have made [an] opening promise" when it was foreseeable that experts would not be called). Nonetheless, where counsel has adequately prepared and made a reasonable investigation, remaining uncommitted to a specific trial strategy or changing strategy mid-trial is not necessarily deficient performance. See Guarino, 293 F.3d at 28 ("It is easy to imagine that, on the eve of trial, a thoughtful lawyer may remain unsure as to whether to call the defendant as a witness."); Turner v. Williams, 35 F.3d 872, 904 (4th Cir. 1994) (refusing to impose a requirement on "defense counsel to continue to pursue a trial strategy even after they conclude that the original strategy was mistaken or that the client may be better served by a different strategy"), overruled on other grounds by O'Dell v. Netherland, 95 F.3d 1214, 1222 (4th Cir. 1996); cf. Brooks v. Tennessee, 406 U.S. 605, 609, 610 (1972) (recognizing that a defendant "cannot be absolutely certain that his witnesses will testify as expected or that they will be effective on the stand" and thus "may not know at the

---

[13]Where counsel promises the jury a category of evidence (e.g. expert testimony) rather than a specific witness, courts have not found counsel deficient for failing to produce all available evidence within the category so long as the evidence presented fulfills the promise in the eyes of the jury. See, e.g. Yeboah-Sefah v. Ficco, 556 F.3d 53, 77 (1st Cir. 2009) (concluding that counsel had promised only to present expert testimony about the defendant's capacity and had not promised to present either psychologists and psychiatrists or a particular expert psychologist); Alder v. State, No. M2003-02767-CCA-R3-PC, 2004 WL 2984845, at *5 (Tenn. Crim. App. Dec. 16, 2004) (refusing to hold counsel deficient, who without promising specific witnesses, told the jury "there may be some proof coming out" as to various facts, many of which he elicited on cross-examination).

22

close of the State's case whether his own testimony will be necessary or even helpful to his cause").

Failing to produce promised evidence, however, *may*, depending on the circumstances and the existence of a strategic rationale, constitute deficient performance if the reasons prompting the change in strategy were known to counsel at the time the opening statement was made. See Zimmerman, 823 S.W.2d at 226 ("[N]othing changed during the course of the trial with regard to either the pre-trial statements she had made to officers or the defendant's ability to articulate her defense. In other words, there appears to have been no basis for the sudden change in strategy."); Leibach, 347 F.3d at 259 ("Making . . . promises and then abandoning them for reasons that were apparent at the time the promises were made cannot be described as legitimate trial strategy." (footnote omitted)); cf. Turner, 35 F.3d at 904 ("[A]ssuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is 'virtually unchallengeable.'" (quoting Strickland, 466 U.S. at 690)).

Applying these principles to the facts of this case, we conclude that trial counsel did not perform deficiently when he changed strategies and advised Petitioner not to testify after remarking in opening statement that Petitioner would testify. Trial counsel testified that developments during the course of the trial convinced him Petitioner would be better served by not testifying. First, Ms. Felts' testimony was much more favorable to Petitioner than counsel anticipated, and Mr. Miller's testimony was much less persuasive than counsel anticipated. Second, Petitioner became "extremely anxious and nervous and worried and concerned" as the trial progressed. Both trial counsel and Petitioner testified, in effect, that practice sessions meant to prepare Petitioner to testify frustrated them both. Although he did not provide specifics, trial counsel recalled "certain basic contradictions" in Petitioner's words and deeds "that were going to be very difficult to deal with." While the defense team initially anticipated calling Petitioner to testify, ultimately trial counsel and the attorneys assisting him agreed that it could be "disastrous" if Petitioner took the stand. Additionally, trial counsel had observed the jury "cringe" when the State played audio messages Petitioner had left for Ms. Felts and Mr. Miller, and he did not want to give the State another opportunity to play these messages again in cross-examining Petitioner.

At the post-conviction hearing, Petitioner impressed the post-conviction court with his "extremely compelling" account. The Court of Criminal Appeals described Petitioner's testimony as "competently delivered, credible testimony" and inferred that "trial counsel was incorrect when he judged that Petitioner would be a poor witness because of anxiety." While we agree, so far as a cold record allows, that Petitioner testified credibly and competently some four and a half years after the trial, we disagree with the inference drawn by the Court of Criminal Appeals. It simply does not follow that Petitioner's ability to testify

"competently" and "credibly" at the post-conviction hearing automatically calls into question the correctness of trial counsel's belief that Petitioner would have been a poor witness at trial. More importantly, Petitioner's ability to testify well at the post-conviction hearing is irrelevant to the issue in this appeal because decisions of counsel must be evaluated from the perspective of counsel *at the time of trial*. Hellard, 629 S.W.2d at 9. The relevant inquiry is how Petitioner appeared to trial counsel at trial.

Because developments during trial altered the calculus of whether Petitioner should testify, trial counsel did not perform deficiently by altering the promised trial strategy and advising Petitioner not to testify. Trial counsel's decision not to call Petitioner as a witness was consistent with this altered trial strategy and also does not constitute deficient performance. As a result, we need not address the State's argument that the five factors[14] listed in Zimmerman as relevant to evaluating whether trial counsel is ineffective for failing to call a defendant to testify are inconsistent with Momon v. State, 18 S.W.3d 152, 157 (Tenn. 1999).

Here, trial counsel agreed with his co-counselors, pursued a consistent defense strategy, elicited favorable testimony on cross-examination, and delivered a closing argument supported by evidence admitted at trial. If not perfect, counsel's performance at least fell "within the range of competence required of attorneys in criminal cases." Carpenter, 126 S.W.3d at 887. Thus, the courts below erred in concluding that trial counsel performed deficiently.

### B. Prejudice

As trial counsel's performance was not deficient, we need not address the prejudice prong. Carpenter, 126 S.W.3d at 886 (citing Strickland, 466 U.S. at 697).

### CONCLUSION

The post-conviction court erred in granting relief to Petitioner on the ground that his trial counsel had been ineffective by (1) failing to pursue the "defense" of attempted voluntary manslaughter and (2) advising Petitioner not to testify when he had promised the jury that Petitioner would testify. Therefore, for the reasons stated in this opinion, we reverse

---

[14]Zimmerman lists the five factors as: (1) only the victim and the defendant witnessed the offense; (2) only the defendant could fully articulate the defense theory; (3) the defendant's testimony could not be impeached with prior convictions; (4) the defendant could describe his or her relationship with the victim; and (5) counsel announced that the defendant would testify and explain the circumstances of the offense. 823 S.W.2d at 227 (citing State v. Gfeller, No. 87-59-III, 1987 WL 14328 (Tenn. Crim. App. July 24, 1987)).

the judgment of the Court of Criminal Appeals and remand to the trial court for reinstatement of Petitioner's convictions. It appearing that Petitioner is not indigent, costs of this appeal are taxed to Petitioner.

_____
CORNELIA A. CLARK, CHIEF JUSTICE