IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

## MATTHEW PERRY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 08-02978        Paula L. Skahan, Judge

_____

### No. W2017-00766-CCA-R3-PC

_____

The Petitioner, Matthew Perry, appeals the post-conviction court's denial of his petition for post-conviction relief in which he challenged his convictions for first degree felony murder and attempted aggravated robbery. On appeal, the Petitioner contends that trial counsel rendered ineffective assistance by leaving before the close of the trial, which effectively pressured the Petitioner not to testify in his own defense, and by failing to introduce an exculpatory photograph into evidence. Upon reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Robert Golder, Memphis, Tennessee (on appeal); Stephen C. Bush, District Public Defender; and Neil Umsted, Assistant District Public Defender (at hearing), for the appellant, Matthew Perry.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

**Trial**

The evidence presented at trial established that on October 3, 2007, Mr. Asa McGhee, the victim, was shot and killed in his own home during an attempted robbery perpetrated by the Petitioner and another man identified only as "Big P." The facts relevant to this post-conviction appeal are summarized below; a complete recitation of the evidence presented at trial is included in this court's opinion on direct appeal. *See State v. Matthew Perry*, No. W2010-00951-CCA-R3-CD, 2011 WL 3962865, at *1-8 (Tenn. Crim. App. Sept. 8, 2011), *perm. app. denied* (Tenn. Jan. 10, 2012).

Ms. Paris Humes, the victim's girlfriend and mother of his child, testified that she arrived at the victim's home at approximately 9:30 a.m. on the morning of the murder. She noticed the victim's car parked in the street with its door and trunk open. Ms. Humes got out of her car and saw a man, "Big P," exiting the victim's house. Ms. Humes had never seen "Big P" before that day. She took her baby out of the car, went into the house, and noticed that the wood on the inside of the carport door was cracked. "Big P" followed Ms. Humes inside the house and asked if she was the victim's girlfriend. Ms. Humes replied affirmatively and asked where the victim was. Ms. Humes walked toward the victim's bedroom and could hear voices, one of which belonged to the victim. Inside the bedroom, she saw the Petitioner, whom she knew as "ATL," kneeling over the victim as the victim lay on the floor between the bed and the wall. When "Big P" entered the bedroom, Ms. Humes asked what was happening and he responded, "[Y]ou know what this is." The victim told the Petitioner, "[M]an, I ain't got nothing." Ms. Humes then noticed that "Big P" had a gun, and she began to scream, "[P]lease don't kill him!"

"Big P" then forced Ms. Humes and her baby into a small bathroom connected to the victim's bedroom. Ms. Humes heard the Petitioner tell the victim, "Man, I got your baby in here, and your girl here now, you going to give me the money or what." The victim maintained that the only money he had was in his pants and urged the Petitioner to check his car to confirm that he did not have any money. The Petitioner said they had already checked his car. Ms. Humes then heard the Petitioner say, "[M]an, give me the gun," followed by three to four gunshots. She heard the victim groan after each gunshot except the last. "Big P" told Ms. Humes to stay inside the bathroom. After she heard a car leave, she stepped out of the bathroom to check on the victim. The victim was wrapped in a blanket with multiple gunshot wounds. Ms. Humes heard someone banging on the window and saw Mr. Ponsay Bratcher. Mr. Bratcher said he had called the police. The victim died of multiple gunshot wounds: one in the chest, one in the abdomen, and one in the head.

Ms. Humes testified that she had met the Petitioner while she was with the victim. After introducing Ms. Humes to the Petitioner, the victim told her that the Petitioner wanted to purchase the victim's watch. She had seen the Petitioner at the victim's house

on one other occasion.  She identified the Petitioner in a photographic line-up and again at trial.

Mr. Corey Armstrong, the victim's stepbrother, testified that he was familiar with the victim's possessions and had cleaned the victim's room after emergency personnel left.  Mr. Armstrong said he could not find the victim's wallet, a diamond earring, and the victim's watch.  He described the watch as black with diamonds circling the face.

After his arrest, the Petitioner was interviewed by Memphis police.  When asked if he was responsible for the victim's death, the Petitioner said, "If it wasn't for me, it would have never happened."  The Petitioner gave a description of "Big P" and described the weapon that "Big P" had as a black or silver automatic handgun.  The Petitioner also gave a description of the events on the morning of the victim's murder:

> Big P called and asked me if I knew where any good green was, and I told him my guy got it. We got together and we was fixing to go. On the way there, he kept asking, what he got.  What kind of work he working with. We pull up to the house and park on the side of the road behind his car.  I got out of the car.  I walked up and knocked on the door and ring the doorbell.  Big P got out the car with the gun and was like, man, come on, I know he got something in there.  I go back over there and I ring the side doorbell.  When I walk back to the other side Big P was bum rushing through the door.  He was walking through the house and he saw [the victim] and he fired a shot.  I went on to the side of the bed with [the victim] and was talking to him.  For a span of at least twenty to thirty minutes I was on the side of the bed with [the victim].  Then Big P walked in and said [the victim's] momma was outside.  Big P walked out of the room and came back with a pistol to a girl that wasn't [the victim's] momma.  It was [Ms. Humes], [the victim's] baby's momma she had his baby with her.  I'm telling the dude to give me a gun because she didn't have nothing to do with it, but he didn't give it to me, so I just told [Ms. Humes] and the baby to go in the bathroom.  Like ten minutes later, Big P came back and was like, come on, let's go.  I was still on the side of the bed with [the victim].  After awhile, Big P told me to go.  I started to leave, I heard one more gunshot, so I walked back in there with [the victim].  He was fixing to die, and then I seen Big P pull off in the car, so I ran out of the house and ran around the corner and tried to follow him.  I got around the corner and the car doors was open and the trunk was open.  Big P was in the car talking about we was fixing to go and let's go, and I got in the car with him.  On the way to the house I was just asking him what happened. He said he got bad and he didn't get nothing.  We got back to the Burger

King. I got out of the car and he yanked out in my car. I left and went out of town to Brownsville. I don't even know where my car at. On the [way] back … to the Burger King, Big P told me not to say his name or he knew where my girlfriend and everybody stay at. He said don't put my name in nothing. I didn't even get nothing. I told him all right. I don't know nothing.

The Petitioner did not testify at trial. The jury convicted the Petitioner as charged of both offenses, and he was sentenced to an effective sentence of life in the Tennessee Department of Correction. This court affirmed the convictions on appeal. *State v. Matthew Perry*, 2011 WL 3962865, at *18. The Petitioner filed a timely post-conviction petition.

## Post-Conviction Hearing

At the post-conviction hearing, the Petitioner testified that he had a good working relationship with trial counsel during the course of his trial. He stated that he got along with trial counsel and trusted trial counsel to represent him. He testified that trial counsel visited him on multiple occasions to discuss his case, during which trial counsel reviewed the discovery with him and discussed the Petitioner's decision regarding whether to testify at trial. The Petitioner stated that he informed trial counsel of his desire to testify at trial and that trial counsel never objected to his decision.

The Petitioner testified that after hearing the testimony at trial, he was certain of his decision to testify because "a lot of stuff that was said was very inaccurate." After the State concluded its proof, trial counsel again discussed the Petitioner's decision regarding whether to testify. The Petitioner stated that he told trial counsel that he wanted to testify but that trial counsel informed the Petitioner that he would be going out of town and would not be present for the Petitioner's testimony. The Petitioner stated that trial counsel said substitute counsel would fill in for him if the Petitioner still wanted to testify. The Petitioner testified that he did not know the substitute counsel and that he did not want anyone else representing him. The Petitioner stated that being informed of trial counsel's absence was a big part of his decision not to testify, stating, "I would have been more comfortable with him being there to testify with me."

The Petitioner also testified as to what his testimony would have been at trial. He stated that he had known the victim for several months, that he had previously bought marijuana from the victim, that he formed a "closer relationship over time" with the victim, and that he and victim did not owe each other any money. He stated that he never went by the alias "ATL" or by any alias at all. He testified that he never had a

- 4 -

conversation with the victim or with Ms. Humes about the victim's watch and that he did not have any interest in the watch.

The Petitioner testified that on October 3, 2007, he and "Big P" went to the victim's house to purchase half an ounce of marijuana. The Petitioner stated that he never knew "Big P's" real name and could only provide a description of the man. The Petitioner drove his green Chevrolet Cavalier, with "Big P" in the passenger's seat, to the victim's house. The Petitioner tried to call the victim, but the victim did not answer. The Petitioner then got out of the car and knocked on the door. "Big P" came up from behind the Petitioner, kicked in the door, and rushed inside. The Petitioner was "shocked" and followed "Big P" inside the house. "Big P" ran towards the victim and fired a shot as the victim ran into his bedroom. The Petitioner followed "Big P" and the victim into the bedroom, went to the side of the bed with the victim, noticed that the victim had been shot in the chest, and asked the victim if he was all right. The victim asked the Petitioner why he brought "Big P" to his house, and the Petitioner responded that "Big P" wanted to buy marijuana from the victim. "Big P" stood in the bedroom doorway, waved his gun in the air, and demanded money from the victim. "Big P" then left the room.

The Petitioner testified that he did not have his cellular phone with him, that he tried to call for help on the victim's cellular phone, but that it was not working properly. The Petitioner stated that he never went outside with "Big P" during the incident. When "Big P" came back inside the room, Ms. Humes and her baby were with him. The Petitioner told "Big P" that Ms. Humes "had nothing to do with it" and told Ms. Humes to "just be cool" and to "go in the bathroom." The Petitioner testified that after Ms. Humes went into the bathroom, "Big P" continued to demand money from the victim, and the victim responded that he did not have any money. The Petitioner stated that he asked "Big P" for the gun multiple times. "Big P" did not give him the gun, and instead, "Big P" fired two more shots and ran out of the room. The Petitioner remained in the room for a "little while" and left after he believed the victim had died. The Petitioner stated that, once outside, "Big P" pointed the gun at him and ordered him to get in the car, and the Petitioner complied. While "Big P" drove the Petitioner's car, "Big P" threatened the Petitioner and his family. "Big P" kicked the Petitioner out of the car while in a Burger King parking lot. The Petitioner testified that he never saw his car again and that he was not aware of any items or money taken from the victim.

The Petitioner testified that he found a photograph from the crime scene of what he believed to be the victim's allegedly missing watch ("post-conviction photograph") while reviewing the discovery material sent to him by trial counsel after the trial had concluded. He stated that the watch in the photograph looked like the watch in another photograph ("trial photograph") that was introduced into evidence by the State during the trial. The trial photograph was a photograph taken before the homicide, and it showed

- 5 -

the victim sitting in a chair, with a watch lying face-up in the cup holder. The post-conviction photograph found by the Petitioner depicted a watch lying face-down on a table. The Petitioner testified that when he asked trial counsel about the post-conviction photograph, trial counsel responded that he had never seen it before.

On cross examination, the Petitioner acknowledged that trial counsel was present through closing arguments and did not leave until jury deliberations began. He acknowledged that he was advised of his right to testify and that he did not tell the trial court that his decision not to testify was due to trial counsel informing him that trial counsel would not be present during the his testimony.

Trial counsel testified at the post-conviction hearing that he and the Petitioner got along well and that he discussed the Petitioner's decision of whether to testify "[a]lmost every time [they] spoke." After the State concluded its proof, trial counsel spoke with the Petitioner about his decision of whether to testify again. The Petitioner asked for trial counsel's opinion, and trial counsel told the Petitioner that the decision was for the Petitioner alone to make. Trial counsel told the Petitioner that he was concerned that the Petitioner's testimony could undermine their case strategy. Trial counsel explained that because the Petitioner's statement to the police placed the Petitioner at the scene of the crime, the goal at trial was to show the jury that the Petitioner was a "naïve" juvenile who did not realize what he was getting into when taking "Big P" to the victim's house that day. Trial counsel told the Petitioner that if the Petitioner chose to testify, then the jury might realize that the Petitioner was an intelligent man, which would undermine his strategy. Trial counsel also explained to the Petitioner that he would have to answer some difficult questions such as why he followed "Big P" into the house, why he did not call the police, why he left with "Big P," and why he fled town. Trial counsel testified that he did not tell the Petitioner he would be out of town if the Petitioner chose to testify, stating, "I had no intention of leaving [] court until the trial was over[,] no matter how long it took." Although trial counsel did not remember when he told the Petitioner that he would be leaving, he stated he knew "for a fact" that it was not when the Petitioner was determining whether to testify.

Trial counsel testified that he did leave the trial while the jury was still deliberating and before the verdict was read because his wife had bought tickets to a concert in Nashville for that night. He testified that he told his wife he might not be able to make it to the concert if the trial had not concluded yet. Once the jury was deliberating, trial counsel left, and one of his employees took the jury's verdict in his absence.

Trial counsel testified that midway through the State's proof at trial, the State informed him that it had an additional witness who would testify as to the missing watch.

Trial counsel then learned about the trial photograph, which was later entered into evidence by the State. When shown the post-conviction photograph, trial counsel testified that it could have been the same watch that was in the trial photograph. However, as the post-conviction court noted, the trial photograph was not available during the post-conviction hearing for trial counsel to compare with the post-conviction photograph.

Following the hearing, the post-conviction court entered an order denying the Petitioner's post-conviction petition. Regarding the Petitioner's argument that trial counsel effectively pressured the Petitioner into not testifying, the court held that the Petitioner failed to show deficiency and prejudice. The post-conviction court credited the testimony of trial counsel over the Petitioner's testimony and found the Petitioner's argument to be "implausible and in direct contradiction to [the Petitioner's] previous sworn testimony."

In regard to the Petitioner's argument that trial counsel was ineffective by failing to introduce the post-conviction photograph of the missing watch, the post-conviction court found that the Petitioner failed to show deficiency. The court noted that the Petitioner presented only his own testimony about the photograph and that trial counsel was not questioned about when he became aware of the photograph's existence or if he would have entered the photograph had he been aware of it during trial. The court also noted that the Petitioner did not show that the photograph was what the Petitioner purported it to be — a crime scene photograph taken by investigators of the victim's house. The Petitioner timely appeals.

## ANALYSIS

The Petitioner argues that trial counsel provided ineffective assistance by telling him that trial counsel would not be present if the Petitioner chose to testify at trial and by failing to introduce the post-conviction photograph at trial.

To be granted post-conviction relief, a petitioner must establish that his conviction or sentence is void or voidable due to the abridgement of any constitutional right. T.C.A. § 40-30-103. The petitioner has the burden of proving the allegations of fact by clear and convincing evidence. *Id.* § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Factual findings by the post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). This court may not substitute its inferences for those drawn by the trial judge, and

"questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Claims of ineffective assistance of counsel in post-conviction petitions are regarded as mixed questions of law and fact. *Grindstaff*, 297 S.W.3d at 216. Thus, our review is de novo with no presumption of correctness. *Pylant v. State*, 263 S.W.3d 854, 867-68 (Tenn. 2008) (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to effective assistance of counsel. To prevail on a claim for ineffective assistance, a petitioner must prove "that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To demonstrate deficiency, a petitioner must show "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 687). A petitioner "'must show that counsel's representation fell below an objective standard of reasonableness' guided by 'professional norms' prevailing at the time of trial." *Id.* (quoting *Strickland*, 466 U.S. at 688) (internal quotations omitted). On review, counsel's performance is not to be measured by "20-20 hindsight." *Id.* at 277. Instead, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citing *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). The court must presume that counsel's acts might be "'sound trial strategy,'" and strategic decisions are "'virtually unchallengeable'" when made after a thorough investigation. *Id.* (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, "a petitioner must establish 'a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A petitioner must show that counsel's performance was so deficient that it deprived the petitioner "of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463). "Failure to establish either deficient performance or prejudice necessarily precludes relief." *Felts*, 354 S.W.3d at 276.

### I. Right to Testify

The Petitioner argues that trial counsel provided ineffective assistance when he informed the Petitioner that trial counsel would not be present if the Petitioner chose to

testify, which effectively pressured the Petitioner into not testifying. The Petitioner maintains that prejudice should be presumed under *United States v. Cronic*, 466 U.S. 648 (1984), because his testimony constitutes a critical stage of a judicial proceeding and his right to testify was affected. Alternatively, the Petitioner argues that this court should find actual prejudice because there is a reasonable probability that the jury would have convicted him of a lesser-included offense had he testified at trial.

The Petitioner testified at the post-conviction hearing that his decision not to testify rested on being informed by trial counsel that trial counsel would not be present during the Petitioner's testimony if he chose to testify. The testimony of trial counsel, however, directly contradicted that of the Petitioner. Trial counsel testified that he did not inform the Petitioner that he would be leaving the trial when the Petitioner was deciding whether to testify. Trial counsel informed the Petitioner that the decision to testify was for the Petitioner to make, but trial counsel did provide his own opinion regarding how Petitioner's testimony could affect the overall strategy of the case. The Petitioner acknowledged that during a jury-out hearing at trial, he stated that he had been advised of his right to testify and that he was making his decision voluntarily. He also acknowledged that he did not tell the trial court that his decision was based on trial counsel informing him that trial counsel would be absent during his testimony. The post-conviction court credited the testimony of trial counsel over that of the Petitioner, and the evidence does not preponderate against this finding. *See Ward*, 315 S.W.3d at 465. Accordingly, the Petitioner has not established that trial counsel informed the Petitioner that he would be absent during the Petitioner's testimony and thus did not show deficiency. Because the Petitioner has failed to establish that trial counsel was deficient, he is not entitled to relief under the *Strickland* standard, and we need not reach the issue of prejudice. *See Felts*, 354 S.W.3d at 277.

The Petitioner also argues that prejudice should be presumed under *Cronic* because he believed trial counsel would be absent if he chose to testify and because the Petitioner testifying is a critical stage of a judicial proceeding. In *Cronic*, the United States Supreme Court determined that exceptional circumstances may exist "that are so likely to prejudice the accused" that a denial of a defendant's Sixth Amendment right to counsel is presumed. 466 U.S. at 658. "Most obvious, of course, is the complete denial of counsel." *Id.* at 659. Exceptional circumstances also include the complete failure by counsel "to subject the prosecution's case to meaningful adversarial testing," the denial of the right to cross examination, and where "counsel labors under an actual conflict of interest." *Id.* 659-62, n.31.

Although the State's brief is silent as to this issue, we conclude that the Petitioner is not entitled to relief under *Cronic*. The evidence established that trial counsel was only absent during jury deliberations and the reading of the verdict, and the Petitioner

concedes in his brief that he is not challenging trial counsel's absence during these stages. Instead, the Petitioner maintains that trial counsel's threatened absence pressured the Petitioner into not testifying. As the post-conviction court found, however, trial counsel did not inform the Petitioner at the time he was deciding whether to testify that trial counsel would be leaving early. Since the Petitioner has not established that his decision not to testify was influenced by trial counsel's threatened absence, the Petitioner is not entitled to relief, and we need not determine whether prejudice should be presumed under *Cronic*.

## II. Photograph

The Petitioner argues that trial counsel was deficient in failing to introduce the post-conviction photograph into evidence for the purpose of showing that the missing watch had not be stolen or to impeach the testimony of Ms. Humes.

The Petitioner asserted that the post-conviction photograph was taken of the crime scene and that the watch in the photograph was in fact the same watch that was in the trial photograph admitted by the State. The Petitioner testified at the post-conviction hearing that he found the post-conviction photograph while reviewing his discovery material after his trial had concluded. He also testified that he asked trial counsel about the photograph and that trial counsel responded that trial counsel had never before seen the photograph. However, during the post-conviction hearing, trial counsel was not questioned about his knowledge of the photograph's existence. Trial counsel was merely asked he if believed the watch in the post-conviction photograph was the same watch that was in the trial photograph. Trial counsel was not provided with the trial photograph to review. He was not asked when he became aware of the photograph's existence or whether he would have used the photograph in the trial had he been aware of it. As the post-conviction court noted, the only evidence that trial counsel was unaware of the post-conviction photograph was the testimony of the Petitioner. Accordingly, the Petitioner has failed to meet his burden of establishing by clear and convincing evidence that trial counsel was aware of the photograph and deficient in failing to introduce the photograph. *See Grindstaff*, 297 S.W.3d at 216; T.C.A. § 40-30-110(f).

Moreover, we cannot conclude that there is a reasonable probability that the verdict would have been different even if the watch in the post-conviction photograph was the same watch allegedly stolen from the victim. *See Felts*, 354 S.W.3d at 276. Even if the post-conviction photograph had been admitted during the trial, the evidence would still support the convictions. On direct appeal, this court determined that the evidence was sufficient to support the attempted aggravated robbery conviction because the Petitioner demanded money from the victim, not because the Petitioner attempted to take the victim's watch. *See Matthew Perry*, 2011 WL 3962865, at *18. Ms. Humes

testified that she heard the Petitioner demand money from the victim and the victim respond that he did not have any money. In addition to testifying about the allegedly missing watch, Mr. Armstrong testified that the victim's earring and wallet were missing following his death. This evidence supports the conclusion that the Petitioner attempted to commit aggravated robbery, even if the watch was not taken. *See* T.C.A. §§ 39-12-101; 39-13-401; 39-13-402. Because the Petitioner has failed to establish both deficiency and prejudice, he is not entitled to relief on this claim.

## CONCLUSION

Based on the foregoing reasons, we affirm the post-conviction court's denial of the Petitioner's post-conviction petition.

_____
JOHN EVERETT WILLIAMS, JUDGE