IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 11, 2018

**ADONIS LASHAWN MCLEMORE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3013    Mark J. Fishburn, Judge**

_____

**No. M2018-00351-CCA-R3-PC**

_____

The Petitioner, Adonis Lashawn McLemore, appeals from the denial of post-conviction relief, alleging that trial counsel was ineffective in failing to impeach a witness, to present an alibi witness, and to rebut the State's expert witness. Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and J. ROSS DYER, JJ., joined.

David M. Hopkins, Murfreesboro, Tennessee, for the Petitioner, Adonis Lashawn McLemore.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On the evening of May 5, 2011, the two victims, Jordan Gardner and Jay Artis, were at Out of Bounds nightclub when they met Pamela Jenkins. State v. Joshua L. Carter and Adonis Lashawn McLemore, No. M2014-00767-CCA-R3-CD, 2015 WL 3929635 (Tenn. Crim. App. June 26, 2015). After seeing the victims "flash[ing] their rolls of money," Jenkins called Joshua Carter to setup a robbery. Id. Carter called the Petitioner and they met Jenkins and the two victims in a parking lot across the street from the club. Id. Carter and the Petitioner attempted to rob Gardner when Carter shot and killed Gardner. Id. Jenkins testified at trial that the Petitioner was "scuffling" with Artis when Carter pulled out a gun; however, Artis testified that he was in a car and saw Gardner "struggling" with a man when the man pulled out a gun and shot Gardner. Id.

Artis later identified Carter as the shooter and the Petitioner as standing behind Carter when Gardner was shot. Id. Jenkins, Carter, and the Petitioner were indicted for the instant crimes; the Petitioner was specifically indicted for especially aggravated robbery and first-degree felony murder. Id.; see T.C.A. §§ 39-13-202, -403. After a jury trial, the Petitioner was convicted of the lesser included offenses of facilitation of especially aggravated robbery and facilitation of first-degree murder. Id.; see T.C.A. §§ 39-11-403. The Petitioner received an effective sentence of fifty years. Id. This court affirmed the Petitioner's judgments, and the Tennessee Supreme Court denied permission to appeal. Id. On November 4, 2015, the Petitioner filed a pro se petition for post-conviction relief, which was amended by retained counsel on August 10, 2016.

**Post-Conviction Hearing.** At the November 21, 2017 post-conviction hearing, the Petitioner's wife, Sharonda (Beasley) McLemore, testified that she was in class until approximately 10:00 p.m. on May 5, 2011, and the Petitioner was at their home watching their children. Later that night, she recalled the Petitioner outside "[h]ustling, selling drugs" and stated that the Petitioner did not go to Out of Bounds nightclub that evening. She testified that the Petitioner was with her at their home the entire night and around 1:30 a.m. she told him "it was time to quit serving . . . quit selling the drugs, come on in the house." She said she spoke with trial counsel but was not subpoenaed to testify at trial. She recalled speaking with Metro Police Detectives Andrew Injaychock and Johnny Crumby, Jr. at her home on the night of May 5, 2011, later on at the police station, and again several weeks before trial. At the police station, she said she was asked to identify the Petitioner from an array of photographs and that the detectives recorded the conversation.

On cross-examination, the Petitioner's wife said she was telling the truth and knew she was under oath. She agreed that she previously told the detectives that she went to sleep at 11:00 p.m. on the night in question but denied telling them that she "couldn't say whether or not [the Petitioner] was at the residence after [she] went to bed[.]" She denied telling the detectives she was a "heavy sleeper and [that she] wouldn't have known if he left[.]" She also denied telling trial counsel that she could not verify that the Petitioner was home the entire night. She confirmed she did not attend the Petitioner's trial.

The Petitioner testified that trial counsel should have impeached Pamela Jenkins, hired an investigator, investigated the Petitioner's alibi defense, hired a competing satellite telecommunications expert, and attempted to sever his case from Joshua Carter's case.[1] The Petitioner said he met with trial counsel only twice before trial and that he

---

[1] On appeal, the Petitioner only argues that trial counsel was ineffective for failing to impeach Pamela Jenkins, to provide the Petitioner's wife as an alibi witness, and to rebut the State's expert witness. Accordingly, all other issues are waived.

- 2 -

wrote a letter to the Board of Professional Responsibilities to try to meet with trial counsel. The Petitioner testified that Pamela Jenkins testified at trial that she did not receive a plea deal in exchange for her testimony but that he learned after trial that Jenkins "received only ten years for her role" in the instant crimes. The Petitioner recalled trial counsel cross-examined Jenkins "a little bit" at trial, but the State's objections were sustained by the trial court. He recalled Carter's trial counsel "doing most of all the talking." He stated that Jenkins originally told the Metro Police Detectives that there were three suspects but testified at trial that there were only two suspects involved in the murder. The Petitioner recalled being questioned by Detectives Injaychock and Crumby who told him they had surveillance video footage from the club that evening. He testified that trial counsel did not review the video with him before trial but confirmed the video did not show him inside the club. As the video was entered into evidence, the State explained that it was never alleged that the Petitioner appeared in the video.

The Petitioner could not recall whether he or his wife told trial counsel of the Petitioner's alibi. To his knowledge, trial counsel did not hire an investigator regarding his alibi. The Petitioner could not recall whether trial counsel objected to the State's expert, Special Agent Richard Littlehale, being tendered an expert in satellite telecommunications. The Petitioner contended that Agent Littlehale was not an expert in the field and confirmed that trial counsel did not hire a rebutting expert for the defense. The Petitioner confirmed that he lived approximately four miles from Out of Bounds nightclub and opined that another expert could have testified that the cell phone tower ping "should have showed [he] was at [his] home" and not the club that evening. The Petitioner testified that trial counsel also failed to file a motion to sever his case from Carter's case and explained that he was worried that Carter's "drug-related charges [would] spill over on [his] case[.]" The Petitioner testified that he grew up with Carter and that they spoke "everyday, all day, all during the nights and everything." He stated that trial counsel should have submitted the entirety of his cell phone records to the jury to show that the two men knew each other and spoke often, not just on the night in question. He confirmed talking to Carter that night and explained that Carter wanted to buy drugs. He confirmed telling this to trial counsel but, to his knowledge, trial counsel did not investigate further.

Trial counsel, a criminal defense attorney of thirty-four years, testified that he was retained as counsel for the Petitioner. Trial counsel testified that he prepared for trial by conducting discovery, watching the surveillance video footage, and meeting with the Petitioner numerous times, the Petitioner's wife three times, and the Petitioner's mother once. He confirmed discussing the case and defense strategies with the Petitioner and explained that he "tried his damndest to get the best defense [he] could for [the Petitioner] because [he] thought so much of [the Petitioner's] mother" who was a former

- 3 -

client. Trial counsel testified that the State offered the Petitioner a plea deal but the Petitioner rejected the offer. Trial counsel confirmed he spoke with the State regarding whether Pamela Jenkins was provided a plea deal in exchange for her testimony at trial but said he "never became aware of one." Trial counsel testified that he viewed surveillance video footage from the club that night and that the Petitioner was not depicted. He confirmed that there was a non-functioning video camera in the parking lot across the street from the club where the instant crimes occurred but that there was no video recorded that night.

Regarding the Petitioner's alibi, trial counsel said the Petitioner's wife told him at least three times that the Petitioner "was out selling drugs outside, and somewhere around 11 o'clock she told him to come in. She went back to her bedroom, and she doesn't know what happened, but he was there the next morning when she got up [around] six o'clock in the morning[.]" Trial counsel confirmed that the Petitioner's wife "specifically t[old him] that she couldn't say where [the Petitioner] was from that time she went to bed at 11:00 until she got up the next morning at 6:00[.]" Trial counsel testified that he did not pursue the alibi defense because the Petitioner's wife could not provide the Petitioner's specific location during the time that she was asleep and during the time the homicide occurred. Trial counsel also testified that he did not hire a separate satellite telecommunications expert because "the towers that the phone hit were the towers that the phone hit" and that another expert would not have testified otherwise.

He confirmed speaking with the State prior to trial regarding the reliability of cell phone tower pings and the admissibility of related testimony. He said he cross-examined the State's expert witness, who "conced[ed] that he could not say that the cell phone would use the tower closest to the location, that it could use the tower one ring out[.]" In other words, the State's expert explained that the cell phone tower evidence could not definitively place the Petitioner at the club or the murder scene. Trial counsel stated that he did not believe there was a legal basis for requesting a severance of the Petitioner's case from Carter's case. He explained that he did not attempt to submit the entirety of the Petitioner's cell phone records as evidence because "[t]he closer [the Petitioner and Carter] were, the more it would look like they would commit a crime together." He explained his defense strategy was to argue that the Petitioner "had no idea what was going on at the time the robbery occurred, that he just showed up there because a friend said 'hey, come on out here,' and when []he saw the gun being pulled, he was like, 'Whoa, I don't want anything to do with that.'" He said, "[T]hat was the more logical defense other than trying to make up some alibi defense they didn't have any proof for."

On cross-examination, trial counsel stated that he did not hire an investigator because he "didn't know whether an investigator would have uncovered anything." He said he encouraged the Petitioner to take the plea deal but that the Petitioner "wouldn't

listen to [him] because he believed Joshua Carter had convinced him that he would not be identified."

Detective Andrew Injaychock of the Metro Police Department testified that he was assigned to this case and interviewed the Petitioner and his wife at their home on the night of May 5, 2011, and later at the police station. He did not recall recording the conversation at the police station. On May 24, 2013, several weeks before the Petitioner's trial, Detective Injaychock again interviewed the Petitioner's wife who stated that the Petitioner went to bed with her around 11:00 p.m. on May 5, 2011, that the Petitioner "possibly" could have left the bed, and that she "would not know if he had left" because she was a "heavy sleeper." The Petitioner's wife told Detective Injaychock that the Petitioner had left the home during the night before "because he deals drugs [and] sometimes he would just get up and leave." The Petitioner's wife told him that the Petitioner was in bed with her when she woke up the next morning but that she "couldn't state he was with her all night." Detective Injaychock memorialized this specific interview in a report, which was admitted into evidence. Detective Injaychock confirmed that no notice of alibi was filed in the case and that the Petitioner's wife never attempted to provide an alibi.

On cross-examination, Detective Injaychock confirmed that he collected surveillance video footage from inside and outside of the club but there was no video from the parking lot where the instant crimes occurred. Detective Injaychock explained that the Petitioner became a suspect when "[t]he name 'Boxhead Shawn' kept coming up during interviews and we were able to identify Boxhead Shawn as [the Petitioner]." After the May 5, 2011 interview, Detective Injaychock recalled the Petitioner and his wife came to the police department on their own initiative but he did not recall the Petitioner's wife identifying the Petitioner from a set of photographs. Detective Injaychock confirmed that Pamela Jenkins and victim Jay Artis both identified the Petitioner from photographic lineups as being involved in the instant crimes. Asked by the court whether the Petitioner's wife ever "allude[d] to, intimate[d], [or] g[a]ve any reason to believe that she was an alibi witness[,]" Detective Injaychock stated that she did not and that she consistently said she did not know the Petitioner's whereabouts while she was asleep.

The Petitioner's codefendant, Joshua Carter, testified that he had known the Petitioner since childhood and that they spoke through phone calls and text messages "[e]verday, all day pretty much." Carter testified that he called the Petitioner on the night of the murder to retrieve his marijuana from the Petitioner's home. Carter testified that he "never committed a crime" and did not call the Petitioner to set up the instant crimes. Carter confirmed that he was at the club but denied he was at the parking lot across the

street and said the Petitioner was neither at the club nor the parking lot. He confirmed seeing the Petitioner the next day.

On cross-examination, Carter denied knowing the two victims or discussing robbing them with Pamela Jenkins. Carter confirmed that Jenkins called him after he left the club but stated she wanted to buy marijuana and ecstasy. Carter denied that victim Jay Artis identified him from a photographic lineup and from the witness stand at trial, instead asserting that Artis was "told to pick" him and that Artis "could not pick [Carter] out in court until [the State] showed him a photo lineup that was tainted by the State." Carter denied being involved in the instant crimes.

After the hearing, the post-conviction court entered a written order on January 30, 2018, denying the Petitioner's request for post-conviction relief and concluding that Petitioner failed to show that trial counsel's performance was deficient or prejudicial. The post-conviction court made the following findings of fact:

1. Sharonda McLemore is the wife of the Petitioner. They were living together . . . at the time of the robbery and murder.
2. Ms. McLemore's previous name had been "Sharonda Beasley."
3. Ms. McLemore saw Petitioner on the night of May 5, 2011. She did not see him after she went to bed at 11 p.m.
4. Petitioner was home at 6 a.m. the next day.
5. There is no video evidence that showed Petitioner inside the nightclub or in the parking lot of the club the night of the shooting.
6. Petitioner and his co-defendant were close friends who spoke or texted on their phones daily.
7. Trial counsel and co-defendant's trial counsel cross[-]examined Pamela Jenkins regarding any favorable consideration [for] her testimony for the State.
8. Trial counsel had extensive experience in representing defendants charged with homicide.
9. Trial counsel communicated numerous times with Petitioner as well as with Petitioner's wife and at least once with Petitioner's mother.
10. Trial counsel reviewed discovery and followed his standard protocol in preparing for a criminal trial.
11. Ms. McLemore did not provide an alibi for her husband on the night of the shooting. She told trial counsel she went to bed and Petitioner was home when she woke up.
12. Trial counsel did not file a motion to sever defendants because he did not see a legal basis to do so.

13. Trial counsel did not submit all of Petitioner's phone records to the jury because he did not want the jurors to know how close Petitioner and his co-defendant were with each other.

14. Trial counsel did not hire an expert because he did not see how an expert could refute the testimony regarding the location of the cell tower pings.

15. Trial counsel did not hire an investigator on this case because he did not see any benefit that would be realized in this case by doing so.

16. Trial counsel viewed the video footage from the club and the club's parking lot. There was no video available from the law office across the street.

17. Trial counsel had an offer to settle the case that he urged Petitioner to take. He told Petitioner he would be convicted if he went to trial.

18. Detective Injaychock interviewed Ms. McLemore a few weeks before trial.

19. During that interview Ms. McLemore told the detective she could not alibi Petitioner.

20. Detective Injaychock memorialized Ms. McLemore's statements in a supplemental report.

As relevant to this appeal, the post-conviction court specifically concluded that trial counsel and Carter's trial counsel adequately cross-examined Pamela Jenkins regarding "her motivations for testifying." The court noted that the Petitioner conceded this point at the post-conviction hearing. The court considered trial counsel's cross-examination of Jenkins, and the State's objections sustained by the trial court, and concluded that the Petitioner failed to show how trial counsel was ineffective in his cross-examination. Furthermore, the court accredited the testimony and evidence provided by trial counsel and Detective Injaychock over the testimony provided by the Petitioner's wife concerning an alibi. The court further noted that the Petitioner's wife's "credibility would have been highly questionable" in light of "a valid concern that she would be committing perjury." Finally, the court concluded that trial counsel spoke at length with the State regarding the satellite telecommunications expert's testimony and that "no expert [] could have countered that testimony." It is from this order that the Petitioner now appeals.

## ANALYSIS

The Petitioner argues that he received ineffective assistance of counsel based on trial counsel's failure to impeach a witness, to present an alibi witness, and to rebut the State's expert witness. Specifically, the Petitioner asserts that trial counsel failed (1) to impeach Pamela Jenkins regarding her "favorable" plea deal with the State; (2) to present

the Petitioner's wife as an alibi witness; and (3) to rebut the State's expert witness regarding cell phone tower evidence. The State responds that the Petitioner received effective assistance of counsel and that his arguments are without merit. Upon our review, we agree with the State.

In reaching our conclusion, we are guided by the following well-established law pertaining to post-conviction relief. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

**I.** **Impeachment of Witness.** The Petitioner argues that trial counsel failed to properly impeach Pamela Jenkins regarding her "favorable" plea deal with the State, asserting that Jenkins "lied previously about the incident" and said she had no plea deal. Had Jenkins been properly impeached, the Petitioner argues he would have been acquitted. The State responds that trial counsel properly cross-examined Jenkins, subject to objections sustained by the trial court. At the post-conviction hearing, trial counsel testified that he spoke with the State regarding any deals made with Pamela Jenkins, that he was not made aware of any deals, and that he cross-examined Jenkins accordingly. The post-conviction court concluded that trial counsel adequately cross-examined Jenkins and that the Petitioner failed to prove that trial counsel's actions were deficient or prejudicial. This court has previously held that "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." State v. Kerley, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). "Allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). The post-conviction court's findings are supported by the record, and the Petitioner has failed to demonstrate deficient performance or prejudice therefrom. Accordingly, he is not entitled to relief.

**II.** **Alibi Witness.** The Petitioner argues that trial counsel failed to call the Petitioner's wife as an alibi witness, alleging she could have testified that they were together the entire night. The State responds that the Petitioner's wife told trial counsel and the Metro Police Department on multiple occasions that she could not provide an alibi for the Petitioner's whereabouts on May 5, 2011, between 11:00 p.m. and 6:00 a.m. because she was asleep. At the post-conviction hearing, the Petitioner's wife asserted for the first time that the Petitioner was with her the entire night and that she could provide an alibi for him. However, trial counsel and Detective Injaychock both refuted this testimony, explaining that in multiple interviews and conversations before trial, the Petitioner's wife consistently stated she was a heavy sleeper and could not be sure the Petitioner was in bed with her the entire night. In its ruling, the post-conviction court implicitly accredited the testimonies of trial counsel and Detective Injaychock when it concluded that the Petitioner failed to prove how trial counsel was ineffective for not calling the Petitioner's wife as an alibi witness, noting credibility issues that would have come from her potentially perjured testimony. As previously noted, the credibility of a witness is a factual issue to be determined by the trial court and this court will not re-weigh or re-evaluate the evidence. Accordingly, the Petitioner is not entitled to relief.

**III.** **Expert Witness.** The Petitioner argues that trial counsel failed to present an expert to rebut the State's cell phone tower evidence and prove that the cell phone tower pings showed he was at home and not at the club. The State responds that trial counsel

properly cross-examined the State's expert and that the Petitioner effectively waived this issue by not presenting an expert witness at the post-conviction hearing.

Tennessee law is clear that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is typically the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id.

Although the Petitioner claims that trial counsel should have called a rebutting expert to testify in his defense, he failed to present such an expert at the post-conviction hearing or prove how his or her testimony would have altered the proof at trial. Trial counsel testified that he spoke with the State at length regarding the reliability and admissibility of cell phone tower pings and related expert testimony. He testified that he cross-examined the State's expert witness and that the expert witness conceded that the cell phone could have pinged multiple cell phone towers and explained that the evidence did not definitively place the Petitioner at the club or murder scene. The post-conviction court concluded that trial counsel properly cross-examined the State's expert witness regarding the cell phone tower evidence and that the Petitioner failed to prove deficient performance or prejudice therefrom. Accordingly, we agree with the post-conviction court that the Petitioner failed to establish that trial counsel's performance was ineffective. He is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning and analysis, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 10 -