IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2025

**BRITTNEY FAITH SWAFFORD v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Sevier County**
**No. 21-CR-28193   James L. Gass, Judge**

_____

**No. E2024-01666-CCA-R3-PC**

_____

Petitioner, Brittany Faith Swafford, appeals the denial of her petition for post-conviction relief, arguing that the post-conviction court erred in concluding that she received the effective assistance of trial counsel. Petitioner argues trial counsel's failure to retain an expert witness favorable to the defense and to adequately investigate Petitioner's then undiagnosed mental health condition constituted the ineffective assistance of counsel. She further argues, in the context of her ineffective assistance claim, that trial counsel's failure to investigate her undiagnosed mental health condition prevented her from entering a knowing and voluntary plea. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Susan H. Harmon, Sevierville, Tennessee, for the appellant, Brittney Faith Swafford.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Jimmy Dunn, District Attorney General; and Ronald C. Newcomb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A Sevier County Grand Jury charged Petitioner by presentment with first degree murder, second degree murder, and tampering with evidence following the August 2020

shooting death of Mr. Samuel Lane ("the victim"). Petitioner pleaded guilty by agreement to second degree murder as a Range II offender; in exchange, the State dismissed the remaining two counts and recommended a sentence of twenty-five years' confinement.[1] After accepting the guilty plea and considering victim impact statements during the same hearing, the trial court imposed a twenty-eight year sentence.

## I. Plea Proceedings

At the March 2022 consolidated plea and sentencing hearing, the State set forth the following underlying facts. On or about August 12, 2020, a truck driver traveling east on Interstate 40 near Exit 407 in Sevier County called 911 to report that a passenger vehicle had struck a "pole." Upon arriving at the scene, first responders discovered the deceased victim in the driver's seat of the wrecked vehicle with a single gunshot wound "almost to his mid face in close proximity to his nose." Law enforcement officers then discovered the firearm from which the fatal round was fired in the vehicle's console "laid upside down on its top with the magazine well sticking up." Officers also discovered a single spent shell casing "outside the vehicle on the exit ramp where the concrete ends and the gravel shoulder begins." No one else was present at the scene.

Two weeks later, Petitioner spoke with police and admitted that she traveled with the victim from Cleveland, Tennessee, to Sevier County on the day of his death. Although she admitted to being present in the vehicle at the time of the victim's death, Petitioner insisted the shooting was accidental. In a second statement to police, Petitioner said she did not know how the firearm's trigger came to be pulled. Later, Petitioner told detectives that the firearm had fallen onto the floorboard of the vehicle and that it accidentally discharged as she was picking it up and handing it to the victim. Petitioner acknowledged that she fled the scene before first responders arrived and that she removed her clothes from another vehicle and disposed of them near Exit 75 on Interstate 75 "out of fear of having blood and/or gunshot residue on them."

Petitioner's statements to police were inconsistent with the finding of a preliminary autopsy report that the fatal round traveled at a "slightly downward angle." The report contradicted Petitioner's statement that she had stooped down to pick up the firearm from the vehicle's floorboard and was handing it back to Petitioner when it accidentally discharged. Moreover, the firearm recovered at the scene employed a hinge trigger safety. Had the case gone to trial, the State said its firearms expert would have testified that the

---

[1] At the beginning of the consolidated hearing, the State announced that it had put Petitioner "on notice of Range II -- with twenty-eight years to serve at one hundred percent . . . ." However, when the State recited the terms of the plea agreement later in the hearing, the State recommended a sentence of twenty-five years to serve at one hundred percent. Petitioner did not include the written plea agreement in the appellate record and does not raise this on appeal.

purpose of the hinge trigger safety was "to avoid an accidental misfire or otherwise avoid an accident," and that a person would have "to be very purposeful and intentional in pulling that trigger." Petitioner's version of events was also inconsistent with the forensic evidence recovered from the clothing she was wearing at the time. According to the State, Petitioner's clothing would have tested positive for gunpowder residue had the shooting occurred as she described inside the vehicle. Yet, investigators found no residue on her clothing. In addition to showing these inconsistencies, the State intended to offer the testimony of a co-defendant who would have confirmed that Petitioner shot the victim and then fled the scene. Finally, the State would have introduced evidence that two days prior the victim's death, police responded to Petitioner's home after a witness reported that she attempted to strike [the victim] with a vehicle." Petitioner moved to exclude this evidence during a pretrial hearing; however, the trial court denied her motion.

Both trial counsel ("Counsel") and Petitioner agreed that the State would be able to show the above facts at trial. Petitioner acknowledged she understood her rights as the trial court had explained them and denied having any questions about her rights or the consequences of her guilty plea. After the State announced the terms of the plea agreement, Petitioner agreed with its terms. The court then asked, "Do you have any questions about that plea agreement? And I want to make sure you don't. It's fine to ask me if you do. Do you have any questions?" Petitioner replied, "No, Your Honor." Petitioner denied that anyone had forced or threatened her into pleading guilty. She said she understood the potential sentence she was facing and agreed she was "freely" waiving her right to trial by jury. The court then asked, "And in this case do you freely plead guilty to second degree murder as a Range II offender? If you need a moment, ma'am, I will let you talk to your lawyer, and I'll ask you that question again." Petitioner responded, "Yes, Your Honor." After again offering Petitioner time to consult with her attorney, the court stated, "Let the record reflect [Petitioner is] shaking her head no. All right. I will ask you again. [Petitioner], do you freely and voluntarily plead guilty to second degree murder in this case as a Range II offender?" Petitioner answered, "Yes, Your Honor."

Before accepting Petitioner's guilty plea, the court allowed members of the victim's family to speak. The court said that the victim impact statements would have "no impact whatsoever" on the court's decision to accept the plea. The court heard sworn testimony from the victim's wife, mother, and sister. Following the victim impact statements, the court imposed a twenty-eight year sentence, finding that Petitioner's actions were "calculating [and] cold-blooded," and showed, "a pattern of disrespect, violence, and lack of sympathy toward the victim in this case." After the imposition of her sentence, Petitioner moved for a sentence reduction under Tennessee Rule of Criminal Procedure 35. The trial court denied that motion in September 2022.

- 3 -

## II. Post-Conviction Proceedings

Petitioner timely filed a petition for post-conviction relief in which she argued, among other claims, that she was denied the effective assistance of trial counsel. Petitioner's argument focused on a promised expert witness that never materialized and Petitioner's then undiagnosed mental health condition. At the August 2024 evidentiary hearing, Petitioner acknowledged that she pleaded guilty to second degree murder and that, had she gone to trial, she would have faced up to fifty-one years in prison. She testified that she was "scared" and felt "there was no hope" because Counsel "didn't even get me an expert, and I didn't know what else to do." When questioned about the expert, Petitioner could not identify the purported expert's field of expertise nor the substance of the anticipated testimony.

Petitioner said she repeatedly insisted on going to trial because she was innocent and that anytime she communicated this to her lawyer, Counsel "would get mad and stomp all over the courtroom." She testified that despite her sworn statements during the plea hearing, she did not understand the terms of her plea agreement because she "wasn't even in [her] right mind," and "was scared . . . [and] in shock." Petitioner insisted that she was "just trying to reach out for help, trying to tell somebody I was innocent of this charge, and it was like I had nobody to help me."

With respect to her education, Petitioner testified that she "was in the special education classes and all that stuff growing up," and that she had received some on-the-job nursing training. She said that prison psychologists diagnosed her with schizoaffective disorder after her sentencing in this case.[2] According to Petitioner, at the time of her guilty plea, she was taking "some kind of depression or schizophrenic medicine"; however, the medication was ineffective. Additionally, she was suffering from auditory hallucinations. Although Petitioner conceded that she never raised this issue to the trial court, she said that Counsel was aware of the hallucinations. Petitioner believed that if Counsel had retained an expert to testify on her behalf, "the outcome would have been different."

Petitioner acknowledged that the trial court denied her motion to exclude the evidence of her attempting to "run down" the victim with her vehicle two days before the murder. She testified that she never reviewed, or at least did not remember reviewing, the preliminary autopsy report finding that the round that killed the victim traveled on a downward trajectory. However, she did remember meeting Dr. Andrew Demick and

---

[2] Although there is a large collection of prison psychiatric records included in the appellate record, many of those records are illegible. However, the exhibited records do note that Petitioner was diagnosed with schizoaffective disorder, among other diagnoses, as early as May 9, 2022— close to two months after she entered her guilty plea.

undergoing a forensic psychiatric evaluation. Petitioner also admitted she fled the scene and disposed of her clothing but disagreed with the State's characterization that she hid the clothing. She agreed that she never claimed innocence during the plea hearing nor asked any questions or raised any concerns to the trial court. Although she admitted that she entered the plea agreement, she said that she "made a mistake" and "messed up." She said, "I don't need an insanity defense because I didn't do it."

The State then introduced a report prepared by Dr. Demick after he conducted a court-ordered forensic evaluation of Petitioner on August 20, 2021, to assess Petitioner's competency to stand trial and her mental state at the time of the shooting. In the report, Dr. Demick described Petitioner as "polite, friendly, and completely cooperative," but noted she "presents as an individual with somewhat less than average intellectual abilities." The report reflects Petitioner conveyed significant childhood trauma, including physical and sexual abuse, and that she "occasionally hears voices that may be 'the devil.'" However, Dr. Demick noted that Petitioner "had a hard time specifically explaining what the voices say and how it impacts her." Petitioner asked Dr. Demick if he was the "expert" that Counsel told her she would be meeting. Petitioner admitted to the doctor "that she did not know what the expert would be an expert in but was just repeating what defense counsel had told her." Dr. Demick concluded that Petitioner "clearly understands and appreciates the severity of the charges" and "appears to understand and appreciate the importance of evidence and witnesses." He reported that Petitioner would "likely require some more education and guidance from defense counsel . . . regarding courtroom procedures and legal jargon," but concluded that "despite the likelihood of some learning struggles, [Petitioner] is still quite capable of participating in all aspects of her defense." Dr. Demick also concluded there was no evidence to support an insanity defense.

Counsel testified that she sometimes "had difficulty communicating basic things to [Petitioner] that were simple facts reflected in discovery," which caused her to believe Petitioner might be "intellectually delayed" and led her to seek the forensic evaluation. Petitioner first mentioned the hallucinations to Counsel "after her bond was revoked"; however, Petitioner reported that the voices lessened over time in jail. As to retaining an expert witness, Counsel said that she "wanted to find . . . a gun projectile expert" but could not find one "locally," so she looked "a little further out." After showing the crime scene photographs and location of the spent shell casing to potential experts, Counsel testified she "couldn't get anybody to take the case to say that the gunshot wound was self-inflicted." She had "a former law enforcement [officer] with Pigeon Forge who had experience with guns and shootings" go with her to talk to Petitioner "about the futility of trying to say it was anything other than a shot from another human being other than the deceased." Counsel said she thought Petitioner understood what the expert had said but "didn't like that the facts were bad for her." She also provided the victim's autopsy report to the potential experts. She testified that the victim "was in the driver's side, and he was

slumped over the console and almost into the passenger's seat." When the potential experts considered the crime scene photos of the victim in the car, the autopsy photos, and the location of the spent shell casing, they "all said that they couldn't help me in saying it was suicide." She also testified that she did not consider consulting a medical expert because she "felt everything hinged on that gunshot."

Counsel explained that during the hearing on the motion in limine to exclude the Rule 404(b) evidence, a video was published that showed the victim "in the yard of the house where he had been hit by her," and Counsel learned that eyewitnesses would say that Petitioner struck the victim with her vehicle while he was "on foot." The video also showed Petitioner lying to police officers that she had been inside the apartment all morning, yet she had muddy feet and the victim was sitting in mud in the yard. Counsel testified that after the trial court denied their motion, "we just didn't feel like it was going to be a strong case for us."

Counsel said that in their meetings Petitioner expressed her innocence and claimed she handed the gun to the victim "and it went off accidentally." Counsel said that after speaking with experts and learning "that couldn't be possible," she worried about what Petitioner's testimony at trial would be. She said, "it just seemed the deck was stacked against us." She testified that Petitioner "seemed sad" but that they "had worked really hard as if going to trial" before Petitioner decided to plead guilty. Counsel said that she "did the math" for Petitioner regarding the "fifteen percent sentence credits" and "told her approximately what year and how old she would be when she got out." She believed Petitioner understood the terms of the plea agreement and "seemed resigned and accepting" of it.

Counsel acknowledged that Dr. Demick's report indicated that Petitioner would require "more education and guidance" to understand courtroom procedures and legal jargon. But she noted that the doctor conducted his evaluation well before any expected trial and before the need arose to explain "the tiny nuances of trial." Counsel testified that she explained "the facts as they were" to Petitioner and that, if Petitioner testified at trial, she would be cross-examined by the State and that the questioning "would be harsh at times." Counsel went on to describe Petitioner as "a tearful person" and said that she "coached" her "on making sure she would always be understandable to the jury." In sum, Counsel testified that the trial court's denial of their motion in limine, the proof that the fatal round traveled on a "downward trajectory," the location of the spent shell casing, and the safety features of the pistol were all factors that weighed in favor of accepting the plea offer.

At the conclusion of the post-conviction hearing, Petitioner argued the evidence established "a disconnect from what [Petitioner] hears and what she understands at the

time" but conceded "a deterioration in mental state once incarcerated would not vacate or eviscerate a voluntary and knowing plea and admission of guilt sometime prior to that." Petitioner acknowledged that nothing in the record showed she did not understand what she was doing at the time of entering her guilty plea. Petitioner asserted that Counsel was ineffective for not retaining a medical expert to dispute the preliminary autopsy findings. The State argued that Counsel was "very effective" and that when faced with the reality of bad facts, she negotiated an agreement for a lesser-included conviction and sentence.

The post-conviction court denied relief at the end of the August 2024 evidentiary hearing and entered a written order on October 3, 2024. The court's written order incorporated its oral findings from the hearing and concluded that Petitioner entered a voluntary and knowing plea and that she received effective assistance from Counsel. The court noted that it considered Petitioner's statements from the plea hearing, the September 2022 hearing on Petitioner's Rule 35 motion, and the testimony from the post-conviction evidentiary hearing. The court also considered the testimony of Counsel and found that the defense likely could not support its theory of suicide and that the facts of the case, as described by Counsel, would have "dramatically chang[ed] the likelihood of a potential acquittal in this case." The court accredited Counsel's testimony that she believed Petitioner knew what she was doing in accepting the plea offer and that she adequately explained the plea agreement to Petitioner. The court also found that Petitioner fled the scene, disposed of her clothing, and made incriminating admissions to law enforcement. The court found that Counsel had assessed the "liabilities" presented by the facts in this case and relayed those liabilities to her client for "a full and knowing resolution of [Petitioner's] case." The court concluded that there was no "inappropriate" or "deficient" conduct by Counsel and that Counsel's "efforts . . . were fully compliant with what is expected of a competent professional . . . ."

As to Petitioner's mental state at the time of her plea, the post-conviction court considered the prison psychiatric records and concluded that Petitioner's diagnosis did not "in any way reach back and disqualify her voluntary and knowing plea in this case." The court reviewed the "lengthy" forensic evaluation report submitted by Dr. Demick and accredited Dr. Demick's findings that Petitioner "was competent to assist her counsel and stand trial" and "unable to support a defense of insanity in this case." The court found that Petitioner was "fully informed" of the consequences associated with pleading guilty and "made a voluntary and knowing plea of guilty to receive the benefit of a reduced sentence for second degree murder . . . ." The court considered the record of the plea hearing and found that Petitioner "readily answered the court's questions" and concluded that she "knew exactly what she was doing." The court further concluded that "had there been some expert out there . . . it would not have changed the likelihood of conviction" because the facts were so strongly against Petitioner.

**Analysis**

On appeal, Petitioner claims the post-conviction court erred in denying post-conviction relief, arguing that Counsel was ineffective in failing to (1) retain a favorable firearms expert, (2) retain a favorable medical expert to confirm the initial findings related to cause of death, and (3) adequately address Petitioner's mental health issues that were "prevalent at the time" of her plea agreement and "could have prevented her from understanding the nature of her plea." The State argues the post-conviction court did not err. We agree with the State.

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Both our state and federal Constitutions guarantee the right to effective assistance of counsel. *See* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9. Thus, the denial of effective assistance of counsel is a cognizable claim under our Post-Conviction Procedure Act. *See Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The post-conviction court's factual findings are conclusive on appeal unless the evidence preponderates against them. *See Fields v. State*, 40 S.W.3d 450, 455–57 (Tenn. 2001). But the court's conclusions of law receive no deference or presumption of correctness on appeal. *Id.* at 457–58.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," and "the petitioner bears the burden of overcoming this presumption." *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation modified). To meet this burden, the petitioner must clearly and convincingly prove facts that show counsel's performance was both deficient and prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984); Tenn. Code Ann. § 40-30-110(f) (establishing "clear and convincing" standard for factual allegations). In practice, a petitioner must prove "the *fact* of counsel's alleged error by clear and convincing evidence," and "[i]f that burden of proof is met, the court then must assess under *Strickland*" whether that error constitutes ineffective assistance of counsel. *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009) (emphasis in original). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. To show prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence

in the outcome." *Id*. Failure to satisfy either prong results in denial of relief. *Phillips*, 647 S.W.3d at 401; *Strickland*, 466 U.S. at 687.

When, as here, the issue is that "trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." *Id*. "As a general rule, the only way a petitioner can establish that trial counsel improperly failed to interview a witness is by calling the witness to testify at the post-conviction hearing." *Taylor v. State*, 443 S.W.3d 80, 85 (Tenn. 2014) (citation modified); *see also Ferris v. State*, No. W2011-00746-CCA-R3-PC, 2012 WL 5456096, at *17 (Tenn. Crim. App. Nov. 7, 2012) ("This Court has made clear that a claim of ineffective assistance of counsel arising from the failure to call a witness must be supported by testimony from the witness at the post-conviction hearing."), *perm. app. denied*. This principle applies with equal force when the claim concerns an expert witness. *See, e.g.*, *Delosh v. State*, No. W2019-01760-CCA-R3-PC, 2020 WL 5667487 at *9 (Tenn. Crim. App. Sept. 23, 2020), *perm. app. denied*.

We apply *Strickland* in "challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985). In the context of guilty pleas, to show prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id*.; *see also House v. State*, 44 S.W.3d 508, 516 (Tenn. 2001). To satisfy due process, guilty pleas must be entered knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). In making this determination, the reviewing court must look at the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). Still, a petitioner's "solemn declarations in open court" that a plea is knowing and voluntary creates "a formidable barrier in any subsequent collateral proceeding" because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Transou v. State*, No. W2022-00172-CCA-R3-PC, 2022 WL 8047703, at *9 (Tenn. Crim. App. Oct. 14, 2022).

Petitioner first argues that Counsel was ineffective because she did not obtain a firearms expert to testify on her behalf. The post-conviction court accredited Counsel's testimony, which showed a thorough attempt by Counsel to retain such an expert. When Counsel could not find a local expert, she extended her search beyond the local area. Repeatedly, Counsel presented potential expert witnesses with the facts of Petitioner's case, and each expert explained why the facts contradicted Petitioner's version of events. Counsel went as far as having a former law enforcement officer meet with Petitioner to

explain "the futility" of proving the victim shot himself. Petitioner seemed to understand this fact "but [she] didn't like that the facts were bad for her. The record shows that Counsel conducted a thorough investigation of the facts, consulted multiple firearms experts to support the defense theory of a self-inflicted gunshot wound, and when no expert could be found, altered the trial strategy accordingly. We agree with the post-conviction court's conclusion that Counsel's "efforts in this case were fully compliant with what is expected . . . of a competent professional." *See Strickland*, 466 U.S. 688 (holding deficient performance must fall below "an objective standard of reasonableness" as measured "under prevailing professional norms"). Additionally, Petitioner did not present the testimony of a firearms expert at the evidentiary hearing and, therefore, failed to show how the lack of such testimony prejudiced her defense. *See Black*, 794 S.W.2d at 757 (holding witnesses must be presented at the evidentiary hearing to show prejudice).

Petitioner next argues that Counsel should have retained a medical expert to dispute the preliminary autopsy findings. Petitioner offered no proof that further investigation was warranted or that a medical expert would have benefited the defense, failing to call any medical expert at the evidentiary hearing. This failure alone defeats her claim. *See Black*, 794 S.W.2d at 757. Furthermore, the post-conviction court accredited Counsel's testimony when she was asked whether she considered using a medical expert and she responded, "No, because I felt everything hinged on that gunshot. It was a single gunshot." As discussed above, the record shows that Counsel conducted a thorough investigation of the facts, and the experts with whom she consulted repeatedly told her that the facts did not support a theory of victim suicide. Had this case gone to trial, Counsel would have been free to cross-examine the State's pathologist about the autopsy. The record shows that Counsel conducted a complete investigation of the facts and then made a strategic choice to pursue a particular defense theory. Such choices are "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *see also Felts v. State*, 354 S.W.3d 266, 277, 281 (Tenn. 2011) (holding counsel was not ineffective in failing to pursue alternative defense theory when counsel conducted a complete investigation of the law and facts).

Finally, Petitioner challenges her guilty plea within the context of an ineffective assistance of counsel claim, seeking to rescind her guilty plea because "she did not understand what she was doing" and maintains "her innocence." She argues Counsel was ineffective because she did not investigate Petitioner's mental health condition prior to her guilty plea. Counsel's duty was to conduct a reasonable investigation or make a reasonable decision that further investigation was unnecessary. *See Strickland*, 466 U.S. at 691. Counsel requested a forensic evaluation to investigate Petitioner's mental health, and Dr. Demick evaluated Petitioner several months *before* her guilty plea. The doctor concluded that Petitioner was "quite capable of participating in all aspects of her defense" and that there was no evidence to support an insanity defense. When asked if she felt that Petitioner understood her guilty plea, Counsel testified, "I do. We did, like I said, the math together

of her approximate outdate. We talked about her getting double that amount at trial . . . she seemed resigned" to "accepting a plea deal." The post-conviction court accredited Counsel's testimony over that of Petitioner's. Further, Petitioner presented no evidence that showed that her subsequent mental health diagnosis would have prevented a knowing and voluntary plea at the time of the plea hearing. The only evidence she offered were prison psychiatric records that post-dated her guilty plea. As the post-conviction court phrased it, "a deterioration in mental state once incarcerated would not vacate or eviscerate a voluntary and knowing plea and admission of guilt sometime prior to that, competently done." The court also relied on its own interactions with Petitioner during the plea hearing to discredit her claims that "she did not understand what she was doing." The record shows Petitioner repeatedly affirmed that she knew what she was doing, understood the proceedings, and wished to enter the guilty plea.

We agree with the post-conviction court that Counsel performed competently in investigating Petitioner's mental condition. Petitioner's sworn statements that her plea was knowing and voluntary create "a formidable barrier in any subsequent collateral proceeding" because these declarations "carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74. Petitioner has not overcome this barrier, and she is not entitled to relief.

## Conclusion

We conclude the record supports the post-conviction court's factual findings, and we discern no error in the post-conviction court's application of the law. For these reasons, we affirm the judgment of the post-conviction court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE
